COX COMMUNICATIONS PCS, L.P., A Delaware limited partnership, Plaintiff,

v.

CITY OF SAN MARCOS, a California municipality; F.H. Smith, in his capacity as Mayor of the City of San Marcos; Pia Harris, in her capacity as Vice–Mayor of the City of San Marcos; Hal Martin, in his capacity as a councilmember of the City of San Marcos; Mark J. Rozmus, in his capacity as a councilmember of the City of San Marcos; Lee B. Thibadeau, in his capacity as a councilmember of the City of San Marcos, Defendants.

Civ. No. 01CV2304–B (AJB).

United States District Court, S.D. California.

April 18, 2002.

---

Juanita R. Brooks, Daniel T. Pascucci, Andrew D. Skale, Fish & Richardson, P.C., San Diego, CA, for plaintiffs.

Kevin P. Sullivan, Judith Hartwzig, Lounsbery, Ferguson, Altona & Peak LLP, Escondido, CA, for defendants.

## ORDER GRANTING IN PART, DENYING IN PART, PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BREWSTER, Senior District Judge.

### I. Introduction and Background

Plaintiff Cox Communications PCS, L.P., (d.b.a. Sprint PCS), ("Sprint") is a provider of wireless telecommunications service throughout the San Diego area, including the City of San Marcos ("City"). On April 20, 2001, Sprint requested the right to use the City's public rights-of-way to install various facilities at three sites in the City. The facilities include wireless cell devices that attach to electrical poles and boxes at the base of the poles to provide power to the wireless transmission units. On August 2, 2001, the City indicated that Sprint could not use the public rights-of-way without first obtaining a Conditional Use Permit ("CUP").

The process for receiving a CUP from the City is contained in Title 20 of the San Marcos Municipal Code. To obtain a permit, a party must file an application with the City that includes a complete plan, description of the property, the proposed use, satisfactory evidence that the applicant will begin construction within six months of receiving the permit, and a fee of $3,476. San Marcos Municipal Code § 20.96.170. A public hearing is required. §§ 21.104.070, 20.104.075, 20.104.080. The applicant must show that its proposed use of the rights-of-way will not be "materially detrimental to the public health, safety, or welfare or injurious to the property or improvement in such vicinity and zone in which the property is located" and "will not adversely affect any master or precise plan adopted pursuant to law." § 20.96.170. The City retains unlimited discretion to grant or deny permits. § 20.96.040 ("Use permits may be granted upon such conditions ... as shall deem to be reasonable and necessary or advisable under the cir-

cumstances so that the objectives of this ordinance shall be achieved."); § 20.96.190 ("Use permits may be granted for such period of time and upon such conditions and limitations as may be deemed appropriate."). Violators of the ordinance may be punished by fine and/or imprisonment. §§ 20.112.20, 20.112.30, 20.112.040. Finally, if a permit is granted, the City may require a bond to insure performance and furnish security. § 20.96.050.

On October 1, 2001, Sprint informed the City that it believed the CUP process, as contained in the parts of the San Marcos Ordinance described above, violated Sprint's federal and state rights. On or about November 16, 2001, the City and Sprint met to discuss Sprint's proposed projects and right to install such facilities. The parties did not agree whether the City could require Sprint to receive a CUP before it used the City's rights-of-way. On November 26, 2001, Sprint sent another letter to the City reiterating its earlier legal position about the CUP process and requesting a response within ten days. Sprint has never applied for a CUP pursuant to the ordinance.

On December 14, 2001, Sprint filed the complaint in this case. Among other causes of action, Sprint asserted that the CUP application process was preempted by the Telecommunications Act of 1996 and violated California Public Utilities Code § 7901. Sprint now seeks a preliminary injunction preventing the City from enforcing its application process as it applies to Sprint, pending final judgment in this case.[1]

## II. Preliminary Injunction

■ To obtain a preliminary injunction, the moving party must demonstrate either (1) a combination of probable suc-

cess on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the movant. *Associated General Contractors of Cal. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). These formulations are not different tests but two points on a sliding scale in which as the degree of irreparable harm increases the probability of success on the merits may decrease, and vice-versa. *Id.* The Court emphasizes that any decision on a motion for preliminary injunction is not a decision on the merits and does not bind the Court in further proceedings of this case.

## A. Irreparable Injury and the Balance of Hardships

■ Sprint maintains that it has significant gaps in its service and is losing customers every day its facilities are not placed within the City's rights-of-way. According to Sprint, the continued delay will constitute irreparable harm to its reputation and goodwill.

■ Injury to a business's goodwill and reputation is not easily measurable, and thus supports a finding of irreparable harm. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("Intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *see also AT & T Communications v. City of Dallas,* 8 F.Supp.2d 582, 594 (N.D.Tex.1998) (holding that lost revenues, loss of customers and goodwill "would be very difficult to calculate for the purposes of monetary damages"). Because Sprint has shown that these antennas are crucial to its abili-

1. Pursuant to the defendants' request, the Court takes judicial notice of the San Marcos Ordinance and California Public Utilities Commission General Order 159A. Defendants' Request for Judicial Notice, Exhibits, A–B.

ty to provide adequate coverage to subscribers in the San Marcos area, it has shown a probability of immediate irreparable harm if it is not able to install its facilities. *See Qwest Communications Corp. v. City of Berkeley,* 146 F.Supp.2d 1081, 1103 (N.D.Cal.2001) (holding that a company satisfied the "irreparable harm" prong of the test when it could not install telecommunications facilities in a particular city).

Although the City may suffer harm if the ordinance describing the permit process is enjoined, the balance tips in favor of Sprint. The City is "free to legislate provided it does so within the constraints of federal and state law." *Berkeley,* 146 F.Supp.2d at 1103. Furthermore, if the ordinance that describes the permit process is upheld at trial, Sprint can easily remove the three facilities.

## B. Likelihood of Success

The crux of the case, however, is whether Sprint has a likelihood or probability of success on its claim that the City CUP process violates federal and state law.

### Federal Preemption: The Telecommunications Act of 1996

■ Sprint claims the City CUP process, as described in the San Marcos Municipal Code, is preempted by § 253 of the Federal Telecommunications Act of 1996 ("FTA"). *See* 47 U.S.C. §§ 151 *et seq.* Congress enacted the FTA to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced technologies and services ... by opening all telecommunications markets open to competition." *Cellular Tel. Co. v. Oyster Bay,* 166 F.3d 490, 492–93 (2d Cir. 1999) (*quoting* H.R. Conf. Rep. No. 104–458, at 206 (1996)). Section 253 of the Act defines the boundaries of state and local regulation of telecommunication service providers. 47 U.S.C. § 253 states:

(a) In general: No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority: Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with Section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local governmental authority: Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Section 253 preempts all state and local regulations that "prohibit or have the effect of prohibiting" any company's ability to provide telecommunications services, unless such regulations fall within either of the statute's two safe harbor provisions, sections 253(b) and 253(c). Section 253(b) allows states to adopt "competitively neutral" regulations to "protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." This provision only applies to states (not municipalities), unless "a state specifically delegated the state authority to its local governments." *BellSouth Telecomms., Inc. v. City of Coral Springs,* 42 F.Supp.2d 1304 (S.D.Fla.1999). Without such delegation, local governments can only "manage" the public rights-of-way. "Municipalities therefore have a very limited and pro-

scribed role in the regulation of telecommunications." *City of Dallas,* 8 F.Supp.2d at 591.

Based on this statutory framework, the Court first analyzes whether the City regulations have the effect of prohibiting wireless services under section 253(a), then determines whether any of the regulations are saved by the safe harbor provisions of sections 253(b) or 253(c).

**Section 253(a)**

Section 253(a) preempts regulations that not only prohibit outright the ability of any entity to provide telecommunications services, but also those that "may ... have the effect of prohibiting the provision of such services." 47 U.S.C. § 253(a). In two recent cases, *City of Auburn v. Qwest Corp.,* 260 F.3d 1160 (9th Cir.2001) and *Qwest Communications Corp. v. City of Berkeley,* 146 F.Supp.2d 1081 (N.D.Cal. 2001), the courts had to consider whether section 253 of the Act preempted local ordinances that established permit processes for telecommunications service providers. In *Auburn,* the court held that the lengthy application process, application fees, authority to regulate transferability, consideration of the carrier's legal and technical ability, public hearings, civil and criminal penalties and, most significantly, a reservation of discretion had the effect of violating 253(a). *Auburn,* 260 F.3d at 1175–76. The court noted that "the ultimate cudgel is that each city reserves the discretion to grant, deny, or revoke the franchise." *Id.* at 1176.

In *Berkeley,* the Northern District of California considered a similar local permit process as the one before the court in *Auburn.* The ordinance required the applicants to complete a detailed application process, pay a $ 3,400 registration fee, and attend a public hearing. *Id.* at 1197. Furthermore, after the provider received permission to proceed, the ordinance regulated the installation and operation of the facilities. *Id.* The city was given the ultimate discretion to grant or deny the permit based on many factors, including the carrier's legal and technical ability and evidence of previous convictions or violations of local laws. *Id.* at 1198. Violations of the ordinance were punishable by fine or imprisonment. *Id.* Similar to the court in *Auburn,* the court in *Berkeley* found these regulations had the effect of prohibiting telecommunication services in violation of § 253(a).

Other courts have held similar requirements violate § 253(a). *See e.g., TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81 (S.D.N.Y.2000) (regulations coupled with long approval process are a prohibition); *Bell Atlantic–Maryland, Inc. v. Prince George's County,* 49 F.Supp.2d 805, 814 (D.Md.1999) ("Any 'process for entry' that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decisionmakers to grant or deny permission to use the public rights-of-way 'may ... have the effect of prohibiting' the provision of telecommunications services in violation of the [Act]."); *AT & T Communications v. City of Austin,* 975 F.Supp. 928, 939 (W.D.Tex.1997) ("The threat of criminal sanctions and fines for the failure of an entity to obtain municipal consent can indubitably only be described as a prohibition.").

Based on *Auburn, Berkeley,* and the other cases cited above, the San Marcos CUP process has the effect of prohibiting Sprint and other telecommunications companies from using the public rights-of-way in the City. The City permit process requires a lengthy application process, imposes criminal and civil fines for those who use the right of way without the consent of the city, provides for public hearings, and charges expensive fees. §§ 21.104.070, 20.104.075, 20.104.080, 20.96.170, 20.112.20, 20.112.30, 20.112.40. Most significant is

the fact that the ordinance gives the City unfettered discretion to deny a permit for unspecified reasons. §§ 20.96.040, 20.96.190. Sprint has shown a substantial likelihood of success on its claim that the regulations, considered collectively, create a substantial barrier to entry and thus violate § 253(a).

### 253(c)

Even though the City permit process may violate section 253(a), it will only be preempted if it does not fall under the safe harbor provisions of sections 253(b) and/or 253(c). Section 253(c) permits local regulations that "manage the public rights-of-way." Although the FTA did not define "manage the rights-of-way," the courts, FCC, and legislative history have provided some guidance. In determining the scope of a city's authority to manage public-rights-of-way, the courts in *Auburn* and *Berkeley* looked to the Federal Communications Commission, which states as follows:

> Section 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way.... The types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*In re TCI Cablevision of Oakland County, Inc.,* 12 FCC Rcd 21396 (1997), P103, 1997

WL 580831. Both courts also looked to the comments of Senator Diane Feinstein, who offered examples of the types of restrictions that Congress intended to permit under section 253(c), including requirements that:

> "regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;" (2) "require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies;" (3) "require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;" (4) "enforce local zoning regulations;" and (5) "require a company to indemnify the City against any claims of injury arising from the company's excavation."

*In re Classic Telephone, Inc.* 11 FCC Rcd 13082, 1996 WL 554531 (1996), P39 (*quoting* 141 Cong. Rec. S8172 (daily ed. June 12, 1995) (statement of Sen. Feinstein, *quoting* letter from the Office of City Attorney, City and County of San Francisco)).

The Court must analyze the particular provisions at issue in this case to determine if they permissibly "manage" the rights-of-way, or impermissibly regulate the carriers themselves.

**20.96.040, 20.96.190:** *City retains discretion to grant or deny a permit*

These provisions which give the City the discretion to grant or deny a permit do not fall within the safe harbor provision of § 253(c) and, thus, are preempted. The courts have clearly said that local governments do not have discretion to deny permits. *See Auburn,* 260 F.3d at 1179; *Berkeley,* 146 F.Supp.2d at 1099; *City of Dallas,* 8 F.Supp.2d at 592–93 ("The City does not, however, have the authority to

grant or deny that franchise based on its own discretion.").

**20.96.170(c)** *"That the granting of a CUP will not be materially detrimental to the public, health, safety or welfare or injurious to the property or improvement in such vicinity and zone in which the property is located"*

The first part of this provision that relates to the public, health, safety and welfare is not saved under section 253(c). Although municipalities can "manage" the rights-of-way, they do not have the authority to protect the public safety and welfare, unless this power is delegated to them by the states. *See BellSouth Telecomms., Inc. v. City of Coral Springs*, 42 F.Supp.2d 1304 (S.D.Fla.1999).

The second part of this provision, however, is probably saved under section 253(c). Senator Feinstein, in her comments, notes how section 253(c) allows cities to enforce local zoning laws. *See In re Classic Telephone, Inc.*, at P39, 1996 WL 554531 As a result, section 253 allows a city to prevent injury to property consistent with a zoning law or code.

**20.96.170(d)** *That the granting of a CUP will not "adversely affect any master or precise plan adopted pursuant to law"*

This statute is most likely saved by 253(c) because it "manages" the rights-of-way. As noted above, cities can enforce local zoning laws. As a result, section 253 does not prevent a city from reasonably regulating a rights-of-way in a way that is consistent with a master plan.

**20.104.020:** *To obtain a permit to use the Rights-of-way, a party must file an application with the City with a complete plan, description of the property, the proposed use, and satisfactory evidence that the applicant will begin construction within six months of the permit*

This provision, for the most part, reasonably manages the rights-of-way. As Senator Feinstein points out in her comments, cities are given the authority to "regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts." *In re Classic Telephone, Inc.*, at P39. A complete plan, description of the property, and evidence that the applicant will begin construction within six months is necessary to achieve these goals and, thus, probably constitute permitted local regulation.

Knowing what the *property will be used for*, however, has less to do with management of the rights-of-way than it does with regulation of the carrier. *See City of Coral Springs*, 42 F.Supp.2d at 1309; *TCG New York, Inc.*, 125 F.Supp.2d at 81. Although identifying the proposed use of the facilities may have some relationship to managing the rights-of-way, the connection is too tenuous. *See Auburn*, 260 F.3d at 1180 (noting how provisions which have "simply too tenuous a connection to the 'management of the rights-of-way' will not be saved under 253(c)").

**20.104.070, 20.104.075** *Any application for a permit must have a public hearing*

Public hearings affect the management of the rights-of-way. Public hearings can apprise the City of possible traffic or zoning concerns, issues over which the local government has authority to regulate.

Furthermore, when section 253(c) is read in light of 47 U.S.C. § 332(c)(7)(B), it becomes evident that local governments can conduct public hearings. Section 332(c)(7)(B) says that "nothing in this chapter" should affect the local government's authority "over decisions regarding the placement, construction, and modification of personal wireless services." Subsection 332(c)(7)(B)(iii) states:

Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record.

In this case, the phrase, "contained in the written record," implies a hearing. If public hearings were preempted under section 253, then local governments would be prevented from gaining useful evidence to help them in their decisions over the "placement, construction, and modification of wireless services." This interpretation of section 253(c) would frustrate the purposes of 332(c)(7)(B). Reading the FTA as a whole, public hearings are allowed before municipalities decide whether to issue permits. Although Sprint argues that the holding in *Auburn* is to the contrary, that case is distinguishable in that there the court held public hearings were not allowed before a *franchise* was issued, not a *permit. Auburn,* 260 F.3d at 1180 n. 19 (noting how the "requirement for a public hearing was objectionable to 253(c)").

For these reasons, public hearings are probably saved under section 253(c).

**20.112.020, 20.112.030, 20.112.030** *Violators will be punished by fine and imprisonment*

As long as the City can implement reasonable regulations, it can enforce them without violating section 253. Because §§ 20.112.20, 20.112.30, and 20.112.030 are simply enforcement mechanisms to its regulations of the rights-of-way, these statutes are likely not preempted. *See City of Coral Springs, Florida,* 42 F.Supp.2d at 1310 (holding that these enforcement mechanisms are included in "managing" the rights-of-way). The City, however, cannot use these provisions to enforce any part of the Ordinance deemed invalid by the Court.

**20.96.050:** *City may require a bond to insure performance of conditions and limitations*

The FCC, when defining the contours of local power over the rights-of-way, specifically held that bonding requirements were acceptable. *See In re TCI Cablevision of Oakland County, Inc.,* 12 FCC Rcd 21396, 1997 WL 580831 (F.C.C.1997), P103. This section is probably not preempted.

**253(b)**

The Court also must decide whether section 253(b) saves any of the provisions not saved under section 253(c). Section 253(b) permits states to adopt "competitively neutral" regulations "to protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." This provision only applies to states unless a state delegates this authority to municipalities.

In its complaint, Sprint concedes that in section 7901.1 of the California Public Utilities Code, the state delegated its authority over public safety and welfare to municipalities. The Complaint alleges:

Through California Public Utilities Code Section 7901.1, the state delegated to its lower divisions only the narrower police power of regulating the time, place, and manner of installing such facilities. *This power is limited to exercises necessary to safeguard the public, health, safety and welfare to the extent not prohibited by law.*

Complaint, ¶ 26 (emphasis added). The legislative history of section 7901.1 supports this interpretation, where the Committee noted how it wrote the bill in response to the City's complaints of "a lack of ability to plan maintenance programs, *protect public safety,* minimize public inconvenience, and ensure adherence to sound construction practices." S 621, Util-

ities & Commerce Committee, 3rd Reading (Cal.1995) (emphasis added). Because the City has the right to protect the public safety and welfare, the first part of San Marcos Ordinance § 20.96.170 is probably saved by 253(b) and thus not preempted by the FTA. *See* § 20.96.170 ("That the granting of a variance will not be materially detrimental to the public health, safety, or welfare....").

## Competitively Neutral

■ Sprint further argues the regulations in the City Ordinance cannot be saved under sections 253(c) or 253(b) because they are enforced against Sprint, but not against San Diego Gas & Electric ("SDG & E") and Metricom, Inc. According to Sprint, sections 253(b) and 253(c) allow the City to regulate the rights-of-way, but only in a nondiscriminatory manner.

This argument, however, does not have a likelihood of success because Sprint is unlikely to show that it has been treated unfairly. Sprint alleges SDG & E was not required to obtain CUPs, but was given "virtually unrestricted access to all public right-of-way within the city for purposes of installing gas lines and providing gas service." Complaint, ¶ 37(d). Although SDG & E was given greater access to the public rights-of-way than Sprint, the gas company installs most of its facilities underground which impacts the City's zoning and visual concerns differently than aboveground facilities. Interpreting section 253(c), the First Circuit noted that "[a]s long as the City makes distinctions based on valid considerations, it cannot be said to have discriminated against a service provider." *Cablevision of Boston v. Public Improvement Comm'n*, 184 F.3d 88, 103 (1st Cir.1999); *see also City of Dallas*, 52 F.Supp.2d at 762 ("[B]eing competitively

neutral does not require cities to treat all providers identically and to ignore the significant distinctions among them."); *City of Dearborn*, 16 F.Supp.2d at 792 ("[T]he explicit language of the statute does not require cities to treat all providers identically and to ignore significant distinctions among them."). The City also claims that it would require SDG & E to obtain a CUP if it attempted to build a similar facility as the ones Sprint wants to install. The question of how the City treated Metricom, Inc. is inconclusive, but in any event appears to be moot since no agreement was ever signed between the company and the City.

Moreover, although the phrase, "competitively neutral and nondiscriminatory," in section 253(c) applies to the compensation that can be required, it is questionable whether the expression modifies the *management of the public rights-of-way*, as Sprint contends.[2] The legislative history of this section suggests that it only applies to the compensation a telecommunications provider may be charged.

> Subsection (c) of the new section [253] provides that nothing in new section [253] affects the authority of States of local governments to manage the public rights-of-way or to require on a competitively neutral and nondiscriminatory basis, fair and reasonable compensation for the use of public rights-of-way on a nondiscriminatory basis, provided any compensation required is publicly disclosed.

Conference Report, 142 Cong. Rec. H1111 (daily ed. Jan. 31, 1996) (H.R.Conf.Rep. 104–458). And as the First Circuit noted, "[a]s a matter of bare syntax, we find the language to be unambiguous: the phrase 'on a competitively neutral and nondiscriminatory basis' can only apply to compensation schemes, not management decisions."

**2.** The provision, "for use of public rights-of-way on a nondiscriminatory basis," clearly only modifies "requir[ing] fair and reasonable compensation."

*Cablevision of Boston v. Public Improvement Comm'n,* 184 F.3d 88, 100 (1st Cir. 1999); *see also City of Dallas,* 8 F.Supp.2d at 587 ("§ 253(c) allows states or local governments to 'manage the public rights-of-way' and 'require fair and reasonable compensation' from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way."); *but see TCG Detroit . v. City of Dearborn,* 977 F.Supp. 836, 840–41 (E.D.Mich.1997) (assuming without discussion that "competitively neutral and non-discriminatory basis" modifies "manage the rights-of-way").

Overall, Sprint is not likely to succeed on its argument that it is being unfairly discriminated against by San Marcos in violation of section 253.

Based on this preliminary analysis, all the provisions of the City ordinance as they relate to the CUP process appear to fall within the safe · harbors of sections 253(c) and/or 253(b) except section 20.96.040 and parts of sections 20.96.190 and 20.104.020. As a result, Sprint has shown a likelihood of success on its contention that at least sections 20.96.040, 20.96.190, and 20.104.020 violate the Constitution because they are preempted; Sprint has failed to show a probability of success on its arguments that the other regulations in the San Marcos code are preempted.

**Severability**

 The Court needs to determine whether Sprint has a probability of success on its claim that sections 20.96.040, 20.96.190, and 20.104.20 are not severable. According to California law, an invalid provision can be severed from an ordinance if the provision is grammatically, functionally, and volitionally separable. *See Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 832, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989). The provision is grammatically severable if it is distinct and "can be re-

moved as a whole without affecting the wording of any" of the other provisions. *Hotel Employees and Restaurant Employees Intern. Union v. Davis,* 21 Cal.4th 585, 614, 88 Cal.Rptr.2d 56, 981 P.2d 990 (1999) (*citing Calfarm,* 48 Cal.3d at 822, 258 Cal. Rptr. 161, 771 P.2d 1247). It is functionally severable if it is not vital to the ordinance's operation and purpose. *Id.* Finally, it is "volitionally" severable if it was not critical to the regulation's enactment. *Id.* "The final determination depends on whether the remainder ... is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute." *Calfarm,* 48 Cal.3d at 821, 258 Cal.Rptr. 161, 771 P.2d 1247.

In *Auburn* and *Berkeley,* the courts refused to sever the invalid portions from the remaining parts of the statute. As *Auburn,* 260 F.3d at 1180, noted:

> The Counterclaim Cities' ordinances contain a complex mix of application procedures, approval requirements, required franchise terms, financial and operations disclosure, and discretionary "catchall" clauses whose preempted provisions are so pervasive that it is not practicable to conduct a line-by-line severability analysis of each city's municipal code. Were we to do so, the elimination of preempted sections of the codes would result in regulation requiring a disjointed franchise application, a lack of standards for approval, disapproval, or revocation by the cities, and cross-references leading the reader to non-existent provisions.

*See Berkeley,* 146 F.Supp.2d at 1102 ("It is not possible to sever the many provisions and portions of the Ordinance that appear to be preempted by the FTA. The entire application process and registration and permit requirements are rife with invalid requirements.").

Contrary to the many provisions in *Auburn*, 260 F.3d at 1175–1180, and *Berkeley*, 146 F.Supp.2d at 1097–1100, that were found invalid (i.e., requiring conditions of financial soundness, technical ability, and legal ability; regulating ownership and certain transfers of shares; requiring a description of all services provided by the company currently or in the future; reserving unfettered discretion; requiring most-favored community status; requiring the city to provide free or excess capacity; requiring public hearings) there are only three minor portions of the San Marcos Ordinance which are likely preempted by section 253 (two which reserve unfettered discretion to the City; one which requests the "proposed use" of the cellsite). These sections are grammatically and functionally severable; if they are removed, the rest of the ordinance will remain grammatically intact and functional even though the City cannot ask about the applicant's proposed use and cannot rely on unfettered discretion to determine which carriers are able to use the rights-of-way. Finally, the provisions are probably volitionally severable. Although it is difficult to tell whether San Marcos would have passed the permit process without section 20.96.040 and parts of sections 20.96.190 and 20.104.20, it seems likely that it would have wanted to retain some ability to regulate the rights-of-way. Sprint has failed to demonstrate a likelihood of success on its claim that these sections are not severable from the rest of the statute.

**State law claims**

Sprint asks the Court to preliminarily enjoin the City from enforcing its CUP process because it violates state law. The

Court will not decide this issue because it has declined jurisdiction over Sprint's supplemental state law claims. *See Cox Communications v. City of San Marcos*, Order Granting in Part, Denying in Part, Defendants' Motion to Dismiss, 204 F.Supp.2d 1272 (S.D.Cal.2002); 18 U.S.C. § 1367(c)(1) (allowing district courts to decline supplemental jurisdiction if the claims raise novel or complex issues of state law).[3]

## III. Conclusion

Based on 47 U.S.C. § 253, the Court enjoins *pendente lite* the City from enforcing the following parts of the City ordinance as it applies to Sprint's attempt to install the three facilities in the City public rights-of-way.

It is hereby ordered that the City will **not** enforce § 20.94.040, which states:

*Variances and Use Permits may be granted upon such conditions and limitations and for such periods of time as the City Manager, or designee, Planning Commission or the City Council shall deem to be reasonable and necessary or advisable under the circumstances so that the objectives of this ordinance shall be achieved.*

It is hereby ordered that the City will **not** enforce the part of § 20.96.190, which states:

*Use Permits may be granted for such period of time and upon such conditions and limitations as may be deemed appropriate.*

---

**3.** Sprint attempts to save federal jurisdiction by framing their state law claims as federal claims. According to Sprint, the City impairs a contract Sprint has with the state of California, based on California Public Utilities Code § 7901, in violation of the federal constitution. This argument, however, is unavailing. As discussed more in the Court's motion to dismiss, Sprint does not have a "contract" to use the City's public rights-of-way and, thus, these state law issues never become federal claims.

It is hereby ordered that the City will **not** enforce the part of § 20.104.020(A), which states:

*and proposed use.*

The Court does not enjoin *pendente lite* the City from requiring Sprint to obtain a CUP before it can use the public rights-of-way or from enforcing any other part of the CUP process not specifically enjoined by the Court.

IT IS SO ORDERED.