SPRINT TELEPHONY PCS, L.P., a Delaware limited partnership, and Pacific Bell Wireless, LLC, a Nevada limited liability company, dba Cingular Wireless, Plaintiffs,

v.

COUNTY OF SAN DIEGO, a division of the state of California; Greg Cox, in his capacity as a supervisor of the County of San Diego; Dianne Jacob, in her capacity as supervisor of the County of San Diego; Pam Slater, in her capacity as a supervisor of the County of San Diego; Ron Roberts, in his capacity as a supervisor of the county of San Diego; and Bill Horn, in his capacity as a supervisor of the County of San Diego, Defendants.

No. 03CV1398 BTM(BLM).

United States District Court,
S.D. California.

July 8, 2005.

Andrew D. Skale, Daniel T. Pascucci, Buchanan Ingersoll LLP, San Diego, CA, Counsel for Sprint Telephony PCS, LP.

John J. Sansone, County Counsel, County of San Diego, Thomas D. Bunton, Senior Deputy, San Diego, CA, Counsel for County Defendants.

**ORDER (1) GRANTING IN PART AND DENYING IN PART SPRINT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (2) GRANTING IN PART AND DENYING IN PART COUNTY'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; AND (3) ORDERING ENTRY OF FINAL JUDGMENT**

MOSKOWITZ, District Judge.

On December 1, 2004, Sprint Telephony PCS, L.P. ("Sprint") filed a motion for partial summary judgment. On December 17, 2004, defendants County of San Diego, Greg Cox, Dianne Jacob, Pam Slater, Ron Roberts and Bill Horn (collectively "County") filed a motion for summary judgment, or, in the alternative, partial summary judgment. For the reasons discussed below, Sprint's motion is **GRANTED IN PART AND DENIED IN PART** and the County's motion is **GRANTED IN PART AND DENIED IN PART.**

## I.  *PROCEDURAL BACKGROUND*

Sprint and Pacific Bell Wireless, LLC, dba Cingular Wireless ("Pacific Bell") (collectively "Plaintiffs") commenced this action on July 15, 2003. In their Complaint, Plaintiffs allege that the County's Ordinance No. 9549 N.S. ("WTO" or the "Ordinance"), which amended the San Diego County Zoning Ordinance ("Zoning Ordinance") relating to wireless telecommunications facilities, violates the Federal Telecommunications Act of 1996 (the "TCA"), Pub.L. 104–104, 110 Stat. 56 (1996). The Complaint asserts four causes of action: (1) prohibition of provision of telecommunications service in violation of 47 U.S.C. § 253(a); (2) discriminatory regulation of a public right-of-way in violation of 47 U.S.C. § 253(c) and the Fourteenth Amendment; (3) violation of 42 U.S.C. § 1983; and (4) declaratory judgment.

In an order filed on October 20, 2003, Judge Keep granted in part and denied in part the County's motion to dismiss. Judge Keep granted the motion as to Plaintiffs' second cause of action on the ground that section 253(c) does not provide for a private right of action. Judge Keep also dismissed Plaintiffs' equal protection claim without prejudice. However, the County's motion was denied as to all of the remaining claims. With respect to Plaintiffs' first cause of action, Judge Keep rejected the County's argument that section 253 was inapplicable and that section 332(c)(7) was the only avenue for challenging the Ordinance under the TCA.

On November 13, 2003, the County filed a motion for judgment on the pleadings, arguing that Plaintiffs' first cause of action should be dismissed because there is no private right of action under section 253(a). The County also argued that Plaintiff's third cause of action should be dismissed because there is no section 1983 right of action for violations of section 253(a). In an order filed on January 5, 2004, Judge Keep held that Plaintiffs had a private right of action under section 253(a) and could seek section 1983 remedies for violations of section 253(a). *See Sprint Telephony PCS. L.P. v. County of San Diego,* 311 F.Supp.2d 898 (S.D.Cal.2004).

On September 16, 2004, this case was reassigned to Judge Moskowitz.

On February 8, 2005, Pacific Bell was dismissed from the case with prejudice pursuant to a stipulation and order thereon.

## II.  *FACTUAL BACKGROUND*

### A.  *The WTO·*

The WTO was enacted by the County in April, 2003. The WTO states that its purpose is "to establish comprehensive guidelines for the placement, design and

processing of wireless telecommunications facilities in all zones within the County of San Diego."

The WTO establishes a four-tier application processing structure. (Zon.Ord. § 6985.) Tier 1 applies to invisible wireless facilities and facilities with very low visual impacts. Tier 2 applies to low visibility facilities in the commercial, industrial or special purpose zones, or facilities in any of the zones that are covered by a "Wireless Community Master Plan," as defined by section 6983(W). Tier 4 applies to non-camouflaged towers greater than 60 feet, or 15 feet above the maximum height limit in the zone, whichever is lower, and all facilities in residential and rural zones except those that fall within Tiers 1 and 2. Tier 3 applies to all facilities other than those meeting the criteria of Tiers 1, 2, or 4.

Applications under Tier 1 are processed as administrative site plans, which are reviewed by the Director of the Department of Planning and Land Use ("Director"). Applications under Tier 2 are processed similarly to Tier 1 applications except that they are also subject to community review. Applications under Tiers 3 and 4 are processed as minor use permits and major use permits, respectively. Whether wireless applications are processed under Tier 3 or 4, they must comply with the use permit requirements in §§ 7350–7399 of the County Zoning Ordinance.

The WTO requires all applicants to submit detailed information regarding the proposed wireless facility. Among other things, applicants are required to provide:

● a map showing all the applicant's existing sites in the local service network associated with the gap the facility is meant to close (Zon.Ord. § 6984(A))

● a visual impact analysis (including photo simulations) showing the maximum silhouette, viewshed analysis, color and finish palette and proposed screening (Zon.Ord. § 6984(B))

● evidence that establishes that the proposed facilities have been designed to the minimum height required from a technological standpoint for the proposed site (Zon.Ord. § 6985(C))

● the anticipated maintenance and monitoring program for the antennas, back-up equipment and landscaping (*Id.*)

● Noise and acoustical information (*Id.*)

● a plan showing all proposed landscaping, screening and proposed irrigation (*Id.*)

● a letter stating the applicant's willingness to allow other carriers to co-locate on their facilities (*Id.*)

Furthermore, the Director may "require additional information based upon specific project factors." (Zon.Ord. § 6984.)

The WTO also imposes general regulations and design regulations. (Zon.Ord. §§ 6985(C), 6987.) A number of these regulations pertain to requirements that the facilities be "camouflaged", "consistent with community character," "compatible with existing architectural elements, building materials and other site characteristics," and have minimal "visual impact." (Zon.Ord. §§ 6985(C)(1), (3), 6987(B), (F), (O).)

In addition, the WTO includes the following set-back requirement: "Telecommunications towers located adjacent to a residential use shall be set back from the nearest residential lot line by a distance at least equal to its total height or 50 feet, whichever is greater." (Zon.Ord. § 6985(C)(4).)

B. *The Use Permit Requirements*

The use permit procedures require that applicants submit documents including: a list of the names of all persons having an interest in the application (as well as the

names of all persons having any ownership interest in the property involved); complete plans (including a plot plan); and a description of the property involved and the proposed use permit. (Zon.Ord. § 7354(b)(1)-(2).)

All applications for a use permit are subject to a public hearing requirement. (Zon.Ord. § 7356.) In determining whether to grant a use permit, the Planning Commission (or the Director, in the case of a minor permit) is required to make the following findings:

That the location, size, design, and operating characteristics of the proposed use will be compatible with adjacent uses, residents, buildings, or structures, with consideration given to:

1. Harmony in scale, bulk, coverage and density;
2. The availability of public facilities, services and utilities;
3. The harmful effect, if any, upon desirable neighborhood character;
4. The generation of traffic and the capacity and physical character of surrounding streets;
5. The suitability of the site for the type and intensity of use or development which is proposed; and to
6. Any other relevant impact of the proposed use . . . .

(Zon.Ord. § 7358(a).)

Use permits may be granted or modified "subject to the performance of such conditions . . . and for such period of time as the Planning Commission, the Board of Supervisors . . . or the Director . . . shall deem to be reasonable and necessary or advisable under the circumstances so that the objectives of the Zoning Ordinance shall be achieved." (Zon.Ord. § 7362.) A use permit may be revoked or modified if one or more of the conditions upon which such permit was granted have been violated. (Zon.Ord. § 7382(a)(2).) Any person violating any condition of a use permit shall be deemed guilty of a misdemeanor unless, in the discretion of the prosecutor, it is charged as an infraction. (Zon.Ord. § 7703.)

A major use permit decision may be appealed to the Board of Supervisors. (Zon.Ord. § 7366(a)(1).) A minor use permit decision may be appealed to the Planning Commission. (Zon.Ord. § 7366(a)(2).) Following the filing of an appeal, a public hearing shall be scheduled and noticed and all interested persons may appear and present evidence. (Zon.Ord. § 7366(h).) The authority having appellate jurisdiction may grant or modify the use permit subject to "specified conditions it imposes pursuant to Section 7362" or may revoke or deny the use permit "as is appropriate." (Zon.Ord. § 7366(i).)

## III. DISCUSSION

Sprint seeks partial summary judgment on its section 253(a) claim and section 1983 claim (liability only). The County seeks summary judgment on these same claims.

The County's primary argument is that Sprint cannot challenge the WTO under 47 U.S.C. § 253(a) and is limited to the remedies provided by 47 U.S.C. § 332(c)(7). As discussed below, the Court finds that (1) section 253(a) is applicable; (2) the WTO, as presently drafted, violates section 253(a); and (3) the WTO does not fall within the safe harbor of section 253(c).

The Court also finds that Sprint is not entitled to damages under section 1983 because section 253(a) does not give rise to a private right of action. Nevertheless, Sprint's preemption claim is still viable under the Supremacy Clause.

Accordingly, the Court grants summary judgment in favor of Sprint, and against the County, on Sprint's first cause of action for violation of section 253(a) and fourth cause of action for declaratory re-

lief. The Court grants summary judgment in favor of the County, and against Sprint, on Sprint's third cause of action for violation of 42 U.S.C. § 1983.

## A. *Applicability of Section 253(a)*

The County has resurrected its argument that Sprint's section 253(a) and section 1983 claims fail because section 253(a) is inapplicable. The County reasserts that if Sprint wishes to mount a TCA challenge against the WTO, it must proceed under section 332(c)(7). Once again, the Court rejects this argument.

██ In denying the County's motion to dismiss Sprint's section 253(a) and section 1983 claims, Judge Keep held that section 253(a) applies to facial challenges of ordinances whereas section 332(c)(7) applies to individual siting *decisions* made under an ordinance. Sprint argues that Judge Keep's ruling is "law of the case" that precludes the Court from reexamining the issue. Sprint is incorrect. The doctrine of "law of the case" does not "impinge upon a district court's power to reconsider its own interlocutory order provided that the district court has not been divested of jurisdiction over the order." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir.2001). *See also United States v. Smith*, 389 F.3d 944, 949 (9th Cir.2004).

██ However, for the most part, the Court agrees with Judge Keep's ruling, which is consistent with the language of section 253(a) and section 332(c)(7).[1] Section 253(a) provides: "No state or local *statute* or *regulation* ... may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

(Emphasis added.) In contrast, section 332(c)(7)(A) provides:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over *decisions* regarding the placement, construction, and modification of personal wireless service facilities.

(Emphasis added.)

The County argues that section 332(c)(7) also includes language indicating that section 332 extends to regulations. Specifically, 47 U.S.C. § 332(c)(7)(B) provides, in relevant part:

> (B) Limitations
>
> (i) The *regulation* of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof -
>
>> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>>
>> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>
> \*    \*    \*    \*    \*    \*
>
> (iv) No State or local government or instrumentality thereof may *regulate* the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(Emphasis added.)

Viewing this language in context, however, it is clear that section 332's primary focus is on individual decisions. The provisions of section 332(c)(7)(B) are *limitations* on the general authority set forth in

---

1. The Court notes that the County did not bring a motion for reconsideration before Judge Keep.

section 332(c)(7)(A), which concerns *decisions* regarding the placement, construction, and modification of personal wireless service facilities. Although the term "decisions" could be broadly construed as including regulations, other provisions in section 332(c)(7) indicate that "decisions" refers to decisions on individual applications to place, construct, or modify personal wireless service facilities.

Subsection (c)(7)(B)(ii) provides that "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed ...." Subsection (c)(7)(B)(iii) provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

Subsection (c)(7)(B)(v), the remedy provision, states that "any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days *after such action or failure to act,* commence an action in any court of competent jurisdiction." (Emphasis added.) Reading this provision in conjunction with subsections (c)(7)(B)(ii) and (c)(7)(B)(iii), the phrase "action or failure to act" refers to a decision or failure to make a decision on a request to place, construct, or modify personal wireless service facilities.

The short limitations period set forth in subsection (c)(7)(B)(v) supports the conclu-

sion that section 332 concerns challenges to decisions on individual applications or requests. If the 30–day limitations period governed facial challenges to ordinances, such challenges would have to brought within 30 days of the implementation of the ordinances at issue. Any party who failed to bring suit within the 30 days, even if the party lacked standing at that time, would be barred from raising a facial challenge.[2] Congress could not have intended such a result.

It is possible that a court reviewing an individual decision under section 332 could also properly reach the issue of whether the regulation or ordinance underlying the decision is valid. *See, e.g., APT Pittsburgh, Ltd. v. Penn Township Butler County,* 196 F.3d 469 (3rd Cir.1999). However, nothing in section 332 precludes facial challenges of wireless regulations under section 253(a).

Sprint properly brought its challenge to the WTO under section 253(a). Accordingly, the Court proceeds to the merits of Sprint's 253(a) claim.

**B.  *Section 253(a) Preemption***

Section 253(a) is an express preemption clause which bars all state and local regulations that "prohibit or have the effect of prohibiting" the ability of any entity to provide interstate or intrastate telecommunications service. *See City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1175 (9th Cir. 2001). The question before the Court is whether the regulatory scheme established by the WTO prohibits or has the effect of prohibiting Sprint from providing wireless telecommunications service.[3]

**2.**  In contrast, a six-year statute of limitations applies to an APA challenge to a regulation. *See, e.g., Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988).

**3.**  The County argues that the Complaint does not set forth a preemption claim. The County

points out that although Sprint's second cause of action alleges a violation of section 253(a), it does not mention "preemption." However, the caption page lists "preemption" as one of the causes of action, the body of the Complaint explains that "the preemption under

■ In determining whether section 253(a) preempts an ordinance, courts must analyze whether the ordinance's requirements "in combination" have the effect of prohibiting the provision of telecommunications services. *Auburn*, 260 F.3d at 1175–76. *See also Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1240–42 (9th Cir. 2004). Section 253(a) does not only preempt regulations that actually prohibit the provision of telecommunications services, but also preempts those that "may ... have the effect of prohibiting" the provision of such services. *Auburn*, 260 F.3d at 1175; *Portland*, 385 F.3d at 1241.

■ Courts applying section 253(a) have found that certain features of regulations, in combination, have the effect of prohibiting the provision of telecommunications services. These features include, but are not limited to, numerous submission or disclosure requirements, retention of discretion by the city to require further disclosures, public hearing requirements, unlimited discretion of the city to grant or deny permits, and civil and/or criminal penalties. *See, e.g., Auburn*, 260 F.3d at 1175–77; *Cox Communications PCS, L.P. v. City of San Marcos*, 204 F.Supp.2d 1260 (S.D.Cal.2002); *Qwest Communications Corp. v. City of Berkeley*, 146 F.Supp.2d 1081 (N.D.Cal.2001); *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir.2004).

In *Auburn*, Qwest, a major telecommunications provider, argued that section 253(a) preempted the ordinances of certain Washington municipalities. These ordinances required telecommunications providers to obtain a franchise to install facilities in public rights-of-way. To obtain a franchise, providers were required to submit a lengthy and detailed application form, including maps, corporate policies, documentation of licenses, certain specified

items, and "[s]uch other and further information as may be requested by the City." *Auburn*, 260 F.3d at 1176. Two of the cities required a public hearing before granting or revoking a franchise. *Id.* Each of the franchise systems authorized the cities to consider "discretionary factors that have nothing to do with the management or use of the right-of-way." *Id.* The "ultimate cudgel" was that each city reserved "discretion to grant, deny, or revoke the franchises and the Cities [could] revoke the franchise if the terms in the ordinance [we]re not followed, even allowing the Cities to remove the company's facilities." *Id.* The ordinances also authorized civil and criminal penalties. *Id.*

The *Auburn* court found that "[t]aken together, these requirements have the effect of prohibiting Qwest and other companies from providing telecommunications services and create a substantial barrier to entry into and participation in the ... Cities' telecommunications markets." *Id.* (citations omitted). The court explained that its conclusion was "based on the variety of methods and bases on which a city may deny a franchise, not the mere franchise requirement, or the possibility of denial alone." *Id.* at 1176 n. 11.

In *Qwest Communications v. City of Berkeley*, 146 F.Supp.2d 1081 (N.D.Cal. 2001), the issue before the court was whether Qwest was entitled to a preliminary injunction on its claim that section 253(a) preempted Berkeley's ordinance governing telecommunications carriers seeking to install facilities in public rights-of-way. Under the ordinance, all carriers were required to obtain a Special Telecommunications Permit. *Id.* at 1088. The preliminary process required: registration and applicable fees; licensing for carriers

Section 253 is 'virtually absolute' " (Complaint, ¶ 24), and Sprint seeks injunctive relief. Given that Sprint is seeking damages in

connection with its section 1983 claim, there can be no question that Sprint's section 253(a) claim is a preemption claim.

not exempted from franchising requirements; significant disclosure requirements along with discretion to require further disclosure; and compliance with other federal, state, and local laws such as excavation and encroachment permits. *Id.* at 1097–98. Thereafter, the ordinance imposed requirements concerning "the installation, maintenance, operation, removal and upgrade of any equipment or facilities installed, including record-keeping, reporting, insurance, indemnity, and financial requirements." *Id.* at 1097. After notifying the affected public and holding a public hearing, Berkeley would make a decision on the application based on various enumerated factors. *Id.* at 1098. When the carrier was not exempted from licensing and franchise requirements, Berkeley also considered the type of service provided, the effect on public health, safety and welfare, and "such other [unnamed] factors— as may demonstrate that the grant to use the public rights-of-way will serve the community interest." *Id.* Violation of the Berkeley's ordinance could subject the applicant-carrier to civil and criminal penalties. *Id.* The court found that Berkeley's ordinance imposed an "onerous burden" on telecommunications carriers seeking to enter Berkeley's market and that, accordingly, Qwest had demonstrated a substantial likelihood of success that section 253(a) preempted the ordinance. *Id.*

In *Cox Communications PCS, L.P. v. City of San Marcos*, 204 F.Supp.2d 1260 (S.D.Cal.2002), Cox Communications (dba Sprint PCS) brought a motion for a preliminary injunction, arguing that the City of San Marcos' regulations collectively created a substantial barrier to entry in violation of section 253(a). San Marcos required telecommunications providers to obtain conditional use permits in order to install facilities in public rights-of-way. *Id.* at 1262–63. To obtain a permit, providers were required to file an application, which included a complete plan, descrip-

tion of the property, the proposed use, satisfactory evidence that the applicant would begin construction within six months of receiving the permit, and a fee of $3,476. *Id.* at 1262. A public hearing was required. *Id.* In addition, the applicant was required to show that its proposed use of the rights-of-way w[ould] not be "materially detrimental to the public health, safety, or welfare or injurious to the property or improvement in such vicinity and zone in which the property is located" and "w[ould] not adversely affect any master or precise plan adopted pursuant to law." *Id.* San Marcos retained the discretion to grant permits "upon such conditions . . . as [the City] shall deem to be reasonable and necessary or advisable under the circumstances so that the objectives of this ordinance shall be achieved." *Id.* at 1262–63. Violators of the ordinance could be punished by fine and/or imprisonment. *Id.* at 1263. Relying on *Auburn* and *Berkeley*, the court found that Sprint had established a substantial likelihood of success on its claim that the regulatory scheme created a substantial barrier to entry in violation of section 253(a). *Id.* at 1266.

Courts outside of the Ninth Circuit have also struck down ordinances under section 253(a) based on burdensome submission requirements and/or provisions allowing cities to grant or deny applications for permits or franchises in the exercise of their discretion. For example, in *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir.2004), the court granted summary judgment in favor of Qwest on its section 253(a) claim based on the challenged ordinance's complex informational requirements, provisions allowing the city to demand "such other information as the city may reasonably require," and provisions granting the city broad discretion in determining whether an application was "in the best interest of the public." *Id.* at 1270. The court explained that these provisions allow the city "unfettered discre-

tion" to prohibit the provision of services. *See also TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 82 (2d Cir.2002) ("[T]he Ordinance's provisions allowing the White Plains Common Council to consider *any factor deemed to be in the public interest* provide precisely the sort of discretion to prohibit telecommunications services that § 253 preempts."); *TC Systems, Inc. v. Town of Colonie*, 263 F.Supp.2d 471, 483 (N.D.N.Y.2003) (holding that town's franchise regulations violated section 253(a) because the regulations provided the town with "unbounded discretion to pick and choose between providers.").

Like the ordinances and regulations in the cases discussed above, the WTO includes a number of features that have the collective effect of prohibiting the provision of telecommunications service. Although the WTO establishes a four-tier application processing structure, due to the restrictive requirements of Tiers 1 and 2, all applications within the right-of-way and most outside of the right-of-way have been processed under the use permit requirements of Tiers 3 and 4. (Hamler Decl. Exh. A.)

As detailed in Section II, *supra*, the WTO and the use permit regulations impose burdensome submission requirements. Among other things, applicants must submit a list of the names of all persons having an interest in the application, complete plans, a map showing all the applicant's existing sites in the local service network, a detailed visual impact analysis, evidence that establishes that the proposed facilities have been designed to the minimum height, the anticipated maintenance and monitoring program for the equipment and landscaping, noise and acoustical information, a landscaping plan, a letter stating the applicant's willingness to allow other carriers to co-locate on their facilities "wherever technically and economically feasible and aesthetically desirable," and any "additional information

based upon specific project factors" that the Director may require. (Zon.Ord. §§ 6984(A)-(C), 7354(b)(1)-(2).) The last two requirements are the ones that trouble the Court.

The requirement that applicants state their willingness to co-locate is unreasonable because it is unclear what the terms and conditions of co-location would be (e.g., whether the applicant would receive fair compensation). The provision that applicants provide "any additional information" that may be required is overbroad. No limit is placed on what and how much additional information the Director may require.

Similarly, the use permit requirements allow for the exercise of unfettered discretion at every level of the application process. A permit may be granted if the "location, size, design, and operating characteristics of the proposed use *will be compatible* with adjacent uses, residents, buildings, or structures, with consideration given to" specified factors, including "*any other relevant impact* of the proposed use." (Zon.Ord. § 7358(a)) (emphasis added.) Thus, the decision-maker can consider anything bearing on "compatibility," a subjective and hard-to-define standard in itself. Similarly, considerable discretion may also be exercised in determining whether the proposed facilities are "camouflaged," "consistent with community character," and have minimal "visual impact." (Zon.Ord. §§ 6985(C)(1), (3), 6987(B), (F), (O).)

Use permits may be granted or modified "subject to the performance of such conditions ... and for such period of time as the Planning Commission, the Board of Supervisors ... or the Director ... *shall deem to be reasonable and necessary or advisable under the circumstances* so that the objectives of the Zoning Ordinance shall be achieved." (Zon.Ord. § 7362) (emphasis added.) In other words, the

Director can impose whatever conditions the Director finds appropriate to further the stated purpose of the Zoning Ordinance, which includes the broad goals of public health, safety and welfare, preservation of community character and aesthetic quality, and minimization of intrusion into residential areas. (Zon.Ord. § 6982.)

On appeal, the appellate authority has the same unbridled discretion to grant or modify permits. Section 7336(i) provides that the authority having appellate jurisdiction may grant or modify the use permit subject to "specified conditions it imposes pursuant to Section 7362." [4]

All applications for a use permit and all appeals are subject to a public hearing requirement. (Zon.Ord. §§ 7356, 7366(h).) Pointing to a conference report (H.R. Conf. Rep. No. 104–458 at 208, 1996 U.S.C.C.A.N. at 223), the County argues that Congress envisioned that public hearings would be held on applications to build wireless facilities. The Court agrees that there is nothing wrong with public hearings per se. However, here, there are no provisions restricting what can be discussed at the public hearings. The lack of restrictions on what types of objections or concerns can be raised at hearings is especially problematic in light of the County's unfettered discretion to deny applications or impose conditions upon the granting of applications.

The violation of a condition imposed solely in the discretion of the appropriate authority carries adverse consequences. The permit may be revoked or modified.

(Zon.Ord. § 7382(a)(2).) Furthermore, any person violating any condition of a use permit shall be deemed guilty of a misdemeanor unless, in the discretion of the prosecutor, it is charged as an infraction. (Zon.Ord. § 7703.)

Wireless providers may avoid Tier 3 or 4 review by submitting to a "master plan." However, the "master plan" option presents many of the same problems as Tier 3 or 4 review. A "Wireless Community Master Plan" is defined as:

A Master Plan of preferred sites and designs for a defined geographic area prepared in cooperation with one or more wireless service providers; formally submitted by the community planning group or sponsor group or by a homeowners association representing at least 4,000 residents and at least 5,000 acres to the Director of Planning and Land Use; *reviewed by the Director for such issues as aesthetics and community compatibility;* and following *public review,* approved by the Director.

(Zon.Ord. § 6983(W)) (emphasis added.) There are no constraints on the conditions that can be required in a Wireless Community Master Plan. (Undisputed Fact 29.)

Viewing the provisions discussed above in combination, the Court finds that the County's wireless regulations have the effect of prohibiting the provision of telecommunications services. As in *Auburn,* the County has reserved the discretion to refuse to grant applications on a "variety of methods and bases." *Auburn,* 260 F.3d at 1176 n. 11.[5]

---

4. The County argues that the use permit provisions do not give discretion to *deny* applications, but, rather, to grant or modify. However, there is no real distinction between the County's ability to impose whatever conditions it chooses upon the granting of applications and the discretion to deny applications.

5. Sprint also argues that the WTO's set-back requirement has the effect of prohibiting

wireless service. Based on the evidence before the Court, it is unclear whether, if applied as written, the set-back requirement would prevent the placement of wireless facilities in large areas of the County. However, the Court need not reach this issue because it finds that the WTO is preempted for the reasons discussed above. Moreover, the County claims that it has interpreted the set-back

Relying on *Portland,* 385 F.3d at 1242, the County argues that the Court should not apply section 253(a) to the use permit requirements because such requirements preexisted the WTO and apply to all applications for a conditional use permit. However, *Portland* is distinguishable. In *Portland,* Qwest challenged a number of ordinances that had been adopted over the course of many years and were applicable to utilities generally. Other than Ashland, Eugene, and Springfield, there was no indication that Portland or the other city defendants had passed ordinances that were specific to the telecommunications process. *Id.* at 1242. Although Eugene had enacted a telecommunications ordinance, Qwest did not challenge the telecommunications ordinance but, rather, separately challenged six general Eugene Code provisions that were not telecommunications-specific. *Id.* at 1242 nn. 5–6. It was in this context that the Ninth Circuit noted, "We doubt whether *City of Auburn* can be read so broadly as to apply to ordinances that are not specific to the telecommunications permitting process." *Id.* at 1242.

Here, Sprint challenges the entire regulatory scheme established by the WTO. Although the use permit provisions are not telecommunications specific, they are an integral part of the wireless regulatory framework governing wireless providers. Accordingly, the Court properly included the use permit provisions in its section 253(a) analysis.

C. *Section 253(c) Safe Harbor*

■ Regulations that violate section 253(a) are not preempted if they fall within the safe harbor of Section 253(c). Section 253(c) provides:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Sprint argues that section 253(c) is an affirmative defense that the County waived by failing to plead it in its answer. The Court disagrees. Consideration of section 253(c) is a necessary part of the preemption analysis under section 253, not a defense. *See Portland,* 385 F.3d at 1242 n. 7 ("If the district court finds that any of the Cities' ordinances are preempted by § 253(a), it must also consider whether the preempted ordinance provisions fall within the savings clause of § 253(c).")

■ The County contends that the WTO is saved by section 253(c) because it is a zoning ordinance which manages the public rights-of-way. However, the WTO is not limited to the regulation of wireless facilities in the public rights-of-way. The WTO applies to "all proposed wireless facilities in the unincorporated area of the County, including those located on private property as well as those within the County-owned rights-of-way." (County's Mem. of Points and Authorities in Support of Motion for Summary Judgment, 2:22–24.) Indeed, according to the County, most of the applications are for proposed facilities on private property. (Sprint's Request for Judicial Notice, Exh. 4, Decl. of David Hulse, ¶ 3.)

Section 253(c) clearly does not apply to the extent that the WTO goes beyond reg-

requirement as not applying to sites located along the County's road or right-of-way.

(Hulse Decl., ¶ 4.)

ulating the public rights-of-way and arguably does not apply to the WTO at all. In *TCG New York, Inc. v. City of White Plains,* 305 F.3d 67, 81 (2d Cir.2002), the Second Circuit held that even though portions of a city proposal (which required prior approval of the locations of the plaintiff's network) might be permissible if *limited to public land,* the sections as written restricted the plaintiff's ability to develop a network *even on private property* and, therefore, were invalid. In cases such as *Auburn* and *Berkeley,* where the courts proceeded to a section 253(c) analysis, the challenged ordinances specifically governed the use of *public rights-of-way* by telecommunication providers.

Even if the Court were to interpret the WTO as applying to the *public rights-of-way only,* many of its requirements would not qualify as "management of the public rights-of-way." In *Auburn,* the Ninth Circuit looked to the FCC's description of management of the public rights-of-way. *Auburn,* 260 F.3d at 1177. According to the FCC:

> [S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way ... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the right-of-way to prevent interference between them.

*In re TCI Cablevision of Oakland County, Inc.,* 12 F.C.C.R. 21396 (F.C.C.1997), ¶ 103.

*Auburn* also quoted Senator Dianne Feinstein, who, during the floor debate on section 253(c), offered examples of the types of restrictions that Congress intended to permit under section 253(c), including requirements that:

> (1) "regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;" (2) "require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies;" (3) "require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;" (4) "enforce local zoning regulations;" and (5) "require a company to indemnify the City against any claims of injury arising from the company's excavation."

*In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082 (F.C.C.1996), ¶ 39 (quoting 141 Cong. Rec. S8172) (daily ed. June 12, 1995) (statement of Sen. Feinstein, quoting letter from the Office of City Attorney, City and County of San Francisco).

Seizing on Senator Feinstein's comment regarding enforcement of local zoning regulations, the County argues that the WTO is a zoning ordinance which falls within the definition of management of the public rights-of-way. The Court rejects the proposition that any requirement that falls within the broad umbrella of "zoning" falls with section 253(c)'s safe harbor.

In *Auburn,* the Ninth Circuit refused to grant safe harbor protection to regulations that were *"more than necessary* to 'manage the rights-of-way.'" *Auburn,* 260 F.3d at 1178 (emphasis added). The court held that regulations requiring the appli-

cant to submit proof of its financial, technical, and legal qualifications and a description of telecommunications services to be provided did not "directly relate" to management of the rights-of-way and were not saved by section 253(c). *Id.* The court also held that the provisions of the ordinances that gave the cities unfettered discretion to insist on unspecified franchise terms and to grant, deny, or revoke a franchise based on unnamed factors went "far beyond the limits of § 253(c), encompassing anything a city deems to be in the public interest." *Id.* at 1179.

Here, as in *Auburn,* the regulations that permit the County to require whatever additional information it chooses and to exercise unfettered discretion in denying or imposing conditions on the granting of a use permit are more than necessary to manage the rights-of-way. These regulations do not fall within the scope of section 253(c).

The WTO does not qualify for safe harbor protection under section 253(c). Therefore, the WTO provisions that violate section 253(a), as discussed in Section III. B., *supra,* are preempted.

D. *Preservation of Zoning Authority*

■ Pointing to the legislative history of section 332 and cases decided under section 332, the County argues that Congress intended to preserve local zoning authority with respect to the placement, construction, and modification of personal wireless service facilities and intended that local governments be able to deny permit applications based on aesthetics and other local zoning criteria. The Court does not dispute this proposition.

However, Congress also placed limitations on local zoning authority. Section 332(c)(7)(B)(i) provides:

The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof -

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

These limitations are consistent with section 253(a)'s proscription against regulations that "prohibit or have the effect of prohibiting" the provision of telecommunications service.

Thus, local governments may, in the exercise of their zoning authority, impose aesthetic requirements (*see, e.g., Ominpoint Communications Enter., L.P. v. Warrington Township,* 63 F.Supp.2d 658 (E.D.Pa.1999) (upholding condition of approval that provider disguise tower as a tree)) or even bar wireless facilities in certain areas (*see, e.g., APT Pittsburgh Ltd. v. Penn Township Butler County,* 196 F.3d 469 (3rd Cir.1999) (upholding validity of zoning ordinance restricting communications towers to certain districts in Township)), *as long as they do not discriminate* against providers of functionally equivalent services *or otherwise prohibit or have the effect of prohibiting* the provision of wireless service. As already discussed, various aspects of the WTO run afoul of the latter limitation on local zoning authority.

E. *Severability*

■ To determine whether the invalid portions of the WTO are severable, the Court must look to state law. *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). As discussed in *Berkeley,* under California law, an offending provision of an ordinance can be severed from the ordinance if the provision is grammatically, functionally, and volitionally separable. *Berkeley,* 146 F.Supp.2d at 1102.

A provision is grammatically severable if it "can be removed as a whole without affecting the wording of any" of the measure's other provisions. *Id.* (quoting *Hotel Employees and Rest. Employees Int'l Union v. Davis*, 21 Cal.4th 585, 613, 88 Cal. Rptr.2d 56, 981 P.2d 990 (1999)). It is functionally severable if it is not necessary to the measure's operation and purpose. *Id.* Finally, it is volitionally severable if it was not of critical importance to the measure's enactment: "The final determination depends on whether the remainder ... is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute." *Id.* (quoting *Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989)).

In this case, the offending provisions are interwoven throughout the Zoning Ordinance and affect, among other things, the application procedures, approval requirements, the discretionary authority to grant or modify permits, public hearing requirements, the revocation of permits, and the imposition of penalties. As in *Auburn,* due to the number and variety of invalid provisions, the Court cannot excise the objectionable portions of the Ordinance "without rendering the end product a Swiss cheese regulation that would not be capable of 'accomplishing the ordinances' legislative purposes."' *Auburn,* 260 F.3d at 1181. *See also Berkeley,* 146 F.Supp.2d at 1102 (explaining that the Court could not sever the preempted ordinance provisions because the entire application process and registration and permit requirements were "rife with invalid requirements.")

Therefore, the WTO is preempted in its entirety. Sprint is entitled to summary judgment on its first cause of action for violation of section 253(a), and the County is enjoined from enforcing the WTO.

### F.   *Section 1983 Claim*

In addition to seeking injunctive and declaratory relief, Sprint seeks damages under 42 U.S.C. § 1983. For the reasons discussed below, the Court finds that section 253(a) does not give rise to a private right enforceable through 42 U.S.C. § 1983.

Whether section 253(a) confers individual rights enforceable through section 1983 is a difficult question which has divided the courts. Some Courts have held that section 253(a) does not give rise to a private right of action under section 1983. *See Qwest Corp. v. City of Santa Fe,* 380 F.3d 1258 (10th Cir.2004); *Qwest Communications Corp. v. City of Berkeley,* 202 F.Supp.2d 1085 (N.D.Cal.2001). Other court decisions, including a prior decision of Judge Keep in this case, hold that section 253 confers a private right of action enforceable through section 1983. *NextG Networks of New York, Inc. v. City of New York,* 2004 WL 2884308 (S.D.N.Y. Dec.10, 2004); *Sprint Telephony PCS v. County of San Diego,* 311 F.Supp.2d 898 (S.D.Cal. 2004). In a two-judge decision, the Eleventh Circuit took a unique approach, holding that section 253 supports a private cause of action under section 1983, but only when the challenged statute, ordinance, or regulation purports to address the management of the public rights-of-way, thereby potentially implicating subsection (c). *BellSouth Telecommunications, Inc. v. Town of Palm Beach,* 252 F.3d 1169 (11th Cir.2001).

To determine which approach is the correct one, this Court must examine the language and structure of section 253 in addition to pertinent legislative history. A court's role in determining whether personal rights exist under section 1983 is no different than its role in discerning whether personal rights exist in the implied right of action context. *Gonzaga Univer-*

*sity v. Doe,* 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). "Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.*

Once a plaintiff demonstrates that a statute creates an individually enforceable right in a class of beneficiaries to which he belongs, there is a rebuttable presumption that the right is enforceable under section 1983. *City of Rancho Palos Verdes v. Abrams,* —— U.S. ——, 125 S.Ct. 1453, 1458, 161 L.Ed.2d 316 (2005). The defendant may rebut this presumption by showing that Congress did not intend a remedy under section 1983. *Id.* Such evidence of congressional intent may be found directly in the statute creating the right or inferred from the statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (quoting *Blessing v. Freestone,* 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)).

The Supreme Court has set forth four factors courts should consider in determining whether a statute impliedly creates privately enforceable rights: (1) whether the plaintiff is "one of the class for whose especial benefit" the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (3) whether implying a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is in an area of law traditionally the concern of the states. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

The second and third factors, which bear upon congressional intent, are determinative. *Currier v. Potter,* 379 F.3d 716, 725 (9th Cir.2004). The second factor, in particular, is "the key inquiry in this calculus." *Opera Plaza Residential Parcel Home-*owners Ass'n v. Hoang,* 376 F.3d 831, 835 (9th Cir.2004).

Here, the second and third factors compel the conclusion that section 253 does not create privately enforceable rights in any context. Section 253 does not explicitly provide for or prohibit private causes of action. However, subsection (d) provides that the FCC shall preempt the enforcement of statutes, regulations, or legal requirements which violate subsection (a) or (b). Notably, subsection (d) does not mention subsection (c). The legislative history explaining the reason for this omission also establishes that Congress did not intend to create privately enforceable rights under section 253.

The legislative history of section 253(d) is set forth in *Palm Beach,* 252 F.3d at 1190–91. As initially drafted, subsection (d) provided for FCC preemption whenever any statute, regulation, or legal requirement violated or was inconsistent with "this section." S. 652, 104th Cong. (1995). Senators Feinstein and Kempthorne expressed concern that subsection (d) would impose a substantial burden on cities that would "have to send delegations of city attorneys to Washington to go before a panel of telecommunications specialist[s] at the FCC, on what may be [a] very broad question of State or local government rights." 141 Cong. Rec. S8170 (daily ed. June 12, 1995). The Senators felt that these types of disputes should be resolved by local federal district courts and sponsored an amendment that would "strike the authority of the Federal Communications Commission to preempt state or local regulations that establish barriers to entry for interstate or intrastate telecommunications services." 141 Cong. Rec. S8305 (daily ed. June 14, 1995).

Senator Gorton responded with an amendment containing the current lan-

guage of subsection (d). Senator Gorton explained:

> So my modification of the Feinstein amendment says that in the case of these purely local matters dealing with rights of way, there will not be a jurisdiction on the part of the FCC immediately to enjoin the enforcement of those local ordinances. But if, under section (b), a city or county makes quite different rules relating to universal service or the quality of telecommunications services—the very heart of this bill—then there should be a central agency at Washington, DC, which determines whether or not that inhibits the competition and the very goals of this bill.
>
> \*     \*     \*     \*     \*     \*
>
> [The Gorton amendment] retains not only the right of local communities to deal with their rights of way, *but their right to meet any challenge on home ground in their local district courts* .... The states retain the right under subsection (d) to pass all kinds of legislation that deals with telecommunications providers, subject to the provision that they cannot impede competition. The determination of whether they have impeded competition, not by the way they manage trees or rights of way, but by the way they deal with substantive law dealing with telecommunications entities. That conflict should be decided in one central place, by the FCC. *The appropriate balance is to leave purely local concerns to local entities, but to make decisions on the natural concerns which are at the heart of this bill in one central place so they can be consistent across the country.*

141 Cong. Rec. S8306, S8308 (daily ed. June 14, 1995) (emphasis added). The Senate voted down the Feinstein–Kempthorne amendment and adopted the Gorton Amendment by a voice vote. *Palm Beach*, 252 F.3d at 1191.

Based on this legislative history, it is clear that when management of public rights-of-way is not at issue, the FCC, not private individuals, has enforcement authority under section 253. The trickier question is whether Congress intended to confer individually enforceable rights when subsection (c) is implicated.

The Eleventh Circuit reasoned that subsection (d) "establishes different forums based on the subject matter of the challenged statute or ordinance," and that a private cause of action exists under section 253 "to seek preemption of a state or local statute, ordinance, or other regulation only when that statute, ordinance, or other regulation purports to address the management of the public rights-of-way, thereby potentially implicating subsection (c)." *Palm Beach*, 252 F.3d at 1191. All other section 253 challenges fall within the jurisdiction of the FCC. *Id.*

The Court disagrees with the reasoning of *Palm Beach*. The objective of the Gorton Amendment was to prevent the FCC from forcing local governments to go to Washington, D.C., to defend ordinances affecting public rights-of-way and to allow challenges to such ordinances to take place in local forums. *Berkeley*, 202 F.Supp.2d at 1096. The focus of the amendment was on *where* preemption challenges would be decided. *Santa Fe*, 380 F.3d at 1266. The amendment was not concerned with whether individual plaintiffs could obtain damages and does not require a finding that Congress intended to create individually enforceable rights under section 253.

*Palm Beach* overlooks the fact that a plaintiff may bring preemption claims under the Supremacy Clause even if the federal statute at issue does not create a private right of action. *Western Air Lines, Inc. v. Port Auth. of New York and New Jersey*, 817 F.2d 222, 225–26 (1987); *Santa Fe*, 380 F.3d at 1267. "A claim

under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied private right of action is a means of enforcing the substantive provisions of a federal law." *Western Air Lines,* 817 F.2d at 225.

The Supremacy Clause is not a "source of any federal rights," but, rather, "secure[s] federal rights by according them priority whenever they come in conflict with state law." *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (internal quotation marks omitted) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). Interestingly, in *Auburn,* the Ninth Circuit applied principles of conflict preemption and found that the challenged ordinances were preempted under the Supremacy Clause (as opposed to preemption through private enforcement of section 253(a)). 260 F.3d at 1180.

Under the Supremacy Clause, the remedy is preemption. In contrast, assuming the existence of a private right of action under section 253, a successful plaintiff would be entitled to damages and attorney's fees. As explained by the court in *Berkeley,* it would be contrary to congressional intent to allow private enforcement of section 253 through section 1983:

It seems highly unlikely that Senator Gorton's amendment, intended to shield local governments from overly burdensome scrutiny or new costs in their efforts to control their public rights-of-way, would simultaneously but silently create the ability of telecommunication providers and/or individual consumers to file suit against the local governments [in] federal court under section 253(c). Under the FTA, these private plaintiffs would potentially be entitled to damages and attorney's fees whereas the FCC is only entitled to preempt the challenged ordinance under subsection (d).

202 F.Supp.2d at 1095–96.

There is no evidence of congressional intent, in the Act itself or the legislative history, to create a private right of action under section 253. Accordingly, the Court holds that section 253(a) cannot be enforced through section 1983, regardless of whether subsection (c) is potentially implicated.[6] To the extent any prior orders of Judge Keep are inconsistent with this order, they are vacated.

This Court's holding is in harmony with the Supreme Court's decision in *Abrams.* In *Abrams,* the Supreme Court held that plaintiffs cannot enforce the limitations on local zoning authority set forth in section 332(c)(7) through section 1983. To the extent that actions may be brought under both section 332(c)(7) and section 253—i.e., actions challenging regulations underlying unfavorable decisions on the ground that they prohibit or have the effect of prohibiting service—finding the existence of a section 1983 claim for violation of section 253 would totally eviscerate the Supreme Court's holding.

---

**6.** The Court disagrees with *Palm Beach* for the additional reason that its holding, while seeming reasonable in theory, is awkward to apply and would, in some instances, have nonsensical results. In this case, for example, the ordinance applies to public rights-of-way but it also applies to private property. Under the *Palm Beach* approach, it seems that Sprint would have a private right of action with respect to its section 253(a) claim because subsection (c) is potentially implicated to the extent that the ordinance applies to the public rights-of-way. However, it is not clear whether the section 1983 action would encompass the entire challenge to the ordinance, which would allow Sprint to recover damages for regulation beyond the public rights-of-way, or whether the 1983 action would be limited to the application of the ordinance to public rights-of-way, which would raise the question of how damages would be determined.

Finally, the Court's preemption analysis in Section III.B–D, *supra*, remains unaffected. As already discussed, Sprint has a valid preemption claim under the Supremacy Clause.

## IV. *CONCLUSION*

For the reasons discussed above, Sprint's motion for partial summary judgment [46–1] is **GRANTED IN PART AND DENIED IN PART** and the County's motion for summary judgment, or, in the alternative, partial summary judgment [54–1; 54–2] is **GRANTED IN PART AND DENIED IN PART**. The Court grants summary judgment in favor of Sprint on its first cause of action for preemption by 47 U.S.C. § 253(a). The Court also grants summary judgment in favor of Sprint on its fourth cause of action for declaratory relief. The Court grants summary judgment in favor of the County on Sprint's third cause of action for violation of 42 U.S.C. § 1983.

The Court issues a declaratory judgment that Ordinance No. 9549 N.S., which amends the San Diego County Zoning Ordinance relating to wireless telecommunications facilities, is preempted 47 U.S.C. § 253(a). The Court also ORDERS that Defendants and their agents and employees, and any other persons acting on behalf of the County of San Diego, are permanently enjoined from enforcing the Ordinance.

The Clerk shall enter final judgment in favor of Sprint and against the County on Sprint's first and fourth causes of action and in favor of the County and against Sprint on Sprint's second and third causes of action.

**IT IS SO ORDERED.**