**NEXTG NETWORKS OF CALIFORNIA, INC.,**
Plaintiff,

v.

**The COUNTY OF LOS ANGELES, CALIFORNIA, Defendant.**

**No. CV 07–2425 ABC (CTx).**

United States District Court,
C.D. California,
Western Division.

June 20, 2007.

Robert L. Delsman, NextG Networks Inc, San Jose, CA, T. Scott Thompson, Davis Wright Tremaine, Washington, DC, Wendy Wu, William F. Bly, Davis Wright Tremaine, Los Angeles, CA, for Plaintiff.

Dawn A. McIntosh, Deborah J. Fox, Meyes, Nave, Riback, Silver & Wilson, Elaine M. Lemke, Richard D. Weiss, Office of the County Counsel, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

AUDREY B. COLLINS, District Judge.

On April 19, 2007, Plaintiff NextG Networks of California, Inc. ("Plaintiff") filed the instant motion for a preliminary injunction. Defendant County of Los Angeles (the "County") opposed on May 21, 2007, and Plaintiff replied on May 29, 2007. The hearing on this matter was held on June 18, 2007. Based on the arguments of the parties and the pleadings in this case, the Court hereby GRANTS IN PART the motion for a preliminary injunction.

## I. INTRODUCTION

Title 22 of the Los Angeles County Municipal Code, the County's zoning ordinance, has been in effect since 1927. However, that ordinance has now come into conflict with the federal Telecommunications Act (the "TCA"), 47 U.S.C. § 253 (1996), and the Court must decide which law prevails.

Plaintiff is a telecommunications company seeking to utilize the rights-of-way in the County for its telecommunications services. The County seeks to manage the rights-of-way for the ten-million-plus people in Los Angeles County. To do that, the County has imposed on Plaintiff the Conditional Use Permits Ordinance ("CUP"), section 22.56 of the County Code, a process through which Plaintiff can gain approval for erecting its equipment on public property. Plaintiff claims the process is so cumbersome so as to erect a

barrier to its entry into the telecommunications market.

In the TCA, Congress anticipated this precise conflict and determined that any state or local laws erecting such barriers must be preempted. The Court finds that, in this case, this Congressional mandate trumps and section 22.56 must be preempted.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a communications service provider and a "telephone corporation" as defined by California law. Specifically, Plaintiff holds a "Certificate of Public Convenience or Necessity" from the California Public Utilities Commission, which authorizes it to operate as a telephone corporation under California law. (Declaration of Patrick S. Ryan ("Ryan Decl.") ¶ 4.) Plaintiff provides the "transport" of voice and data communications between points designated by customers without altering the communications. (Declaration of Nicole Mason ("Mason Decl.") ¶ 5.) Plaintiff's customers are not end-users, but are typically providers of retail wireless services which in turn provide services to end-users. (*Id.*)

Plaintiff's typical telecommunications service offering involves a communication signal handed off from Plaintiff's customer to Plaintiff, which Plaintiff then transports over a network of fiber optic facilities. (*Id.* ¶ 5.) These handoffs take place via equipment called "nodes" located on utility or streetlight poles in public rights-of-way or in private utility easements. (*Id.* ¶ 6.) These nodes, which include, *inter alia,* antenna, fiber optic lines, and a power supply, are all owned, operated, and maintained by Plaintiff. (*Id.*) Plaintiff's equipment also includes a fiber optic network that carries signals to a "base station," a structure often on private proper-

ty, which is where Plaintiff then returns the signal to the customer. (*Id.* ¶ 7.)

To construct the nodes and lay the fiber optic cabling, Plaintiff must have access to County rights-of-way. (*Id.* ¶ 8.) Timing of this access has become critical to Plaintiff because it has undertaken contractual obligations that impose strict timelines on providing service. (*Id.* ¶ 11.) For example, under its current contracts, Plaintiff must have both the fiber optics and the nodes ready for one customer by November 30, 2007 and for another customer, by December 31, 2007. (*Id.*) This is apparently no easy task, requiring Plaintiff to undertake at least the following steps:

- Coordinating with other utilities using any right-of-way, which can take anywhere from sixty to ninety-plus days;
- Securing a[CUP] under the County's ordinances;
- Securing an encroachment permit once a CUP is approved;
- Constructing the nodes on existing utility poles, which takes at least 20 days;
- Obtaining electric services once the nodes are installed;
- Testing and optimizing the newly installed equipment, which itself takes two to three weeks minimum; and
- Engineering and installing fiber optics aerially and/or underground, which entails a multi-step process of route selection, design, and field surveys.

(Declaration of Todd Schultz ("Schultz Decl.") ¶¶ 8–9.) Plaintiff asserts that the only way to meet its current contractual deadlines is to initiate construction of the nodes and fiber optics by September 30, 2007. (*Id.* ¶ 11.)

Plaintiff has worked with the County on these projects in the past. (Declaration of Patrick S. Ryan ("Ryan Decl.") ¶ 3.) For example, in August 2005, Plaintiff sought

three encroachment permits from the County, which the County summarily rejected, forcing Plaintiff instead to undertake the more cumbersome CUP process set forth in section 22.56 of the County's zoning code. (*Id.*) Plaintiff claims that, although its proposed installations are similar to many other facilities that are located in the rights-of-way pursuant to encroachment permits, the County insisted on imposing the CUP process on it. (*Id.*) Plaintiff submitted CUP applications in January 2006, which the County approved in November 2006 and issued some two months later. (*Id.*)

Similarly, in early 2006, Plaintiff sought approval for another significant project. (*Id.* ¶ 4.) Plaintiff informed the County that it qualified as a telephone corporation under California law and must be treated nondiscriminatorily, but the County still required Plaintiff to proceed via the CUP process. (*Id.*) Because the parties disputed the application of the CUP process to Plaintiff's activities, the County agreed to "expedite" treatment of Plaintiff's CUP applications. (*Id.* ¶ 7.) Plaintiff then successfully deployed that project, which took six months. (Mason Decl. ¶ 20.)

For the projects arising from Plaintiff's current contractual obligations, Plaintiff applied for CUPs on March 1, March 15, and April 3, 2007. (*Id.* ¶ 18.) The County has not agreed to expedite the consideration of these applications, however. (*Id.* ¶ 19.) Plaintiff fears the CUP approval process will delay commencing construction beyond its September 30, 2007 deadline. (*Id.*) Plaintiff asserts that this delay will result not only from the statutory terms of the CUP process, but also from unwritten requirements, such as approval from the "Altadena Town Council," which requires Plaintiff to submit information beyond that which is required by section 22.56, such as photo simulations, details regarding service area coverage, details

regarding antenna engineering, and aesthetic concerns. (Ryan Decl. ¶ 8.)

Plaintiff asks the Court to enjoin the County from enforcing section 22.56, claiming that its provisions are cumbersome and thus preempted by the TCA, 47 U.S.C. § 253. Moreover, Plaintiff complains that the County must be enjoined because complying with the CUP process will cause irreparable harm to its reputation and business goodwill should such compliance cause Plaintiff to breach its contracts with its customers.

## III. STANDING

■ Although the parties did not raise the issue of Plaintiff's standing to seek an injunction in their original briefing, the Court has an independent obligation to do so whenever it appears that standing may be lacking. *See Amer. Civil Liberties Union of Nev. v. Lomax,* 471 F.3d 1010, 1015 (9th Cir.2006) ("Although neither party raises the justiciability issues of standing and mootness on appeal, we have an 'independent obligation' to consider them *sua sponte.*"). On June 6, 2007, the Court ordered the parties to submit simultaneous briefing addressing the issue of standing. Both parties filed these briefs on June 12, 2007. Having considered all the briefing by the parties, the Court holds that Plaintiff has standing to seek a preliminary injunction.

"Standing is an 'essential component' of the case and controversy requirement of Article III, § 2 of the United States Constitution." *Id.* "The irreducible constitutional minimum of standing contains three parts: (1) injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Because Plaintiff has not sought and been denied a permit, it must

demonstrate that it faces an imminent threat of future enforcement to seek a preliminary injunction. *See San Diego Cty. Gun Rights Committee v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996); *see also Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir. 2000) (*en banc*). The three factors to consider in finding the threat of future enforcement are "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.*

There is little question that Plaintiff faces imminent enforcement of section 22.56. Plaintiff is a party to current contracts requiring it to construct nodes and fiber optic networks along the County's rights-of-way on a tight timeline. Plaintiff's current plan could not be more concrete; declarations submitted by Plaintiff indicate the steps necessary to carry out its plan and Plaintiff has alleged a specific date of the potential injury, September 30, 2007, the last date on which it could possibly begin construction and still meet its contractual deadlines. Further, the County has asserted unequivocally that it will enforce the CUP process against all telecommunications companies erecting wireless equipment. (Declaration of Mark Child ¶ 3 ("In Los Angeles County, all telecommunications companies, including wireless service providers and 'telecommunications carriers,' must obtain a CUP before installing equipment for wireless facilities in the public rights-of-way.").) The County has also subjected Plaintiff to the CUP process for past projects and intends to do so for future projects. (*Id.* ¶¶ 5–8.) Thus, there exists both a history of enforcement and a genuine threat of future enforcement of the CUP process against Plaintiff.

Even though Plaintiff can demonstrate a imminent threat of enforcement, Plaintiff must also demonstrate the three constitutional requirements for standing: injury, causation, and redressability. The injury cannot be "hypothetical" or "too imaginary or speculative to support jurisdiction." *Thomas,* 220 F.3d at 1139. Moreover, causation requires that the alleged injury be "fairly traceable to" the challenged statute. *San Diego Cty.,* 98 F.3d at 1130 (finding no causation where the economic injury alleged by the plaintiffs could have been the result of other legislation, or "th[e] result of the independent action of some third party not before the court." (citation omitted)). Redressability requires "that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bonnichsen v. United States,* 367 F.3d 864, 872–73 (9th Cir.2004) (citing *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). To determine redressability, however, the Court must not look at "whether a *favorable decision* is likely but whether a favorable decision *likely will redress* a plaintiff's injury." *Id.* at 873 (emphasis in original). Even though these are three separate requirements, the speculativeness of the injury often overlaps with causation and redressability. *See City of Rohnert Park v. Harris,* 601 F.2d 1040, 1048 (9th Cir.1979) ("[I]ndirectness of injury, while not necessarily fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.'" (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976))).

■ Plaintiff's standing in this case turns on a single issue: how should the Court characterize Plaintiff's injury?

Plaintiff originally described its injury as follows: "Under the County's [CUP] requirements, NextG will not be able to access the public rights-of-way and deploy its network in the time frame required by NextG's customer contractual obligations." (Mot. at 2:10–12.) In its supplemental briefing, Plaintiff clarified that it also sustained injury because "Chapter 22.56 facially violates NextG's legally protected interests under Section 253 of the federal Communications Act and Sections 7901 and 7901.1 of the California Public Utilities Code." (Pl. Supp. Brief at 4:15–17.) Formulated in this second way, Plaintiff has standing to pursue its claims.

Under Plaintiff's "breach-of-contract" injury, the Court would have to speculate that, in enjoining application of the CUP process, Plaintiff would be able to otherwise fulfill its contracts. Enjoining enforcement of section 22.56 would not necessarily guarantee this outcome. Assuming the Court invalidates the entire CUP process in section 22.56, Plaintiff admits that it still must comply with the County's encroachment permit process (which it has not challenged in this litigation) and coordinate with other utilities, steps whose timing "cannot be controlled or accelerated by NextG." (Schultz Decl. ¶¶ 8, 10.) Only after these steps are completed can Plaintiff begin construction (no later than September 30, 2007), which includes constructing nodes and installing fiber, delivering electrical utilities, and testing the equipment. (Id. ¶ 8.) Again, the timing of these steps is at least partly out of Plaintiff's control. (Id. ¶ 10.) By removing the CUP process, a single, although major, hurdle in the marathon of Plaintiff's contractual plans, the Court cannot say with certainty that Plaintiff will not still deliver its performance late, breach its contracts and incur precisely the same injury claimed here.

For this same reason, the Court does not see how the CUP process can be pinpointed as the cause of Plaintiff's potential breaches. In other words, invalidating the CUP process does not ensure that Plaintiff will necessarily avoid the injury it claims. As outlined above, there are many potential causes of a breach of Plaintiff's contracts. As Plaintiff's witness declared regarding the fiber optic part of the process, "[t]he engineering and installation of the fiber is, itself, a multistep process, involving route selection, design, and field surveys, among others, with each step dependent on other factors." (Id. ¶ 9.) This is only one of Plaintiff's many, many obligations and Plaintiff's failure to fulfill any one of them could cause a delay or eventual breach, even if the Court enjoins the CUP process. Removing the CUP process does not guarantee that the Court would remove the cause of Plaintiff's alleged injury.

■ If Plaintiff's injury is characterized as an infringement of Plaintiff's federal rights under the TCA and state rights under California Public Utilities Code section 7901, however, it meets the constitutional elements of standing. Plaintiff claims that section 22.56 erects a barrier to entry into the telecommunications market, which is precluded by the TCA. (Mot. at 20:21–23.) In enacting the TCA, Congress recognized that these barriers can cause harm to companies seeking to provide telecommunications services. See *Sprint Telephony PCS, L.P. v. County of San Diego*, 490 F.3d 700, 718 (9th Cir. 2007) ("When Congress passed the TCA in 1996 it expressed its intent to remove barriers inhibiting the development of telecommunications service.... [I] t established meaningful limits beyond which state and local governments may not inhibit telecommunications by preventing the construction of wireless communications

facilities.").[1] Sometimes "the very promulgation of a law may itself affect a party enough to satisfy the constitutional [case or controversy] requirement[.]" *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1171 (9th Cir.2001). This is precisely the case here. Plaintiff has suffered an injury by the "very promulgation," or here, enforcement, of section 22.56, which is sufficient to create an injury for standing purposes. *See id.* at 1172 n. 6.[2]

Characterizing Plaintiff's injury in this way, the Court finds that Plaintiff also meets the other standing requirements. Plaintiff's injury, the infringement of federal rights, was caused solely by the enforcement of section 22.56 and by enjoining its enforcement as Plaintiff asks, the Court would redress Plaintiff's injury. Therefore, Plaintiff has standing to challenge section 22.56.

## IV. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir.1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted). "Thus, the greater the rel-

ative hardship to [a plaintiff], the less probability of success must be shown." *Id.; see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993). A preliminary injunction is an "extraordinary remedy" for which the need must be "clear and unequivocal." *Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir.1976).

## V. ANALYSIS

### A. Likelihood of Success on the Merits.

#### 1. *Federal Preemption*

■ Subsections (a) and (c) of the Telecommunications Act of 1996, 47 U.S.C. § 253 ("Removal of Barriers to Entry") state:

(a) In general: No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service,

.    .    .    .    .

(c) State and local governmental authority: Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public

---

1. On June 13, 2007, the Ninth Circuit issued an amended opinion and superceded its prior opinion at 479 F.3d 1061 (9th Cir. Mar.13, 2007). All citations herein are to the most recent amended opinion.

2. The discussion of ripeness in *City of Auburn* may not apply in 21 this case because that case is factually distinct. In that case, the plaintiff already maintained equipment on public property and the City forced it to take a franchise license or face criminal sanctions for ongoing non-compliance. 260 F.3d at

1171. This created an alleged "Hobson's choice" of compliance or facing criminal enforcement. *Id.* at 1172. Here, in contrast, Plaintiff has not erected any equipment and has not been put in a similar dilemma. In any event, because Congress clearly sought to remove barriers preventing companies from entering the telecommunications market, the Court finds that *City of Auburn's* rationale applies under the TCA and Plaintiff has suffered an injury from the County's creation of a barrier itself, i.e., the "very promulgation" of section 22.56.

rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

The Ninth Circuit has recognized that section 253(a) broadly preempts local regulation of the telecommunication industry: "The preemption is virtually absolute and its purpose is clear—certain aspects of telecommunications regulation are uniquely the province of the federal government and Congress has narrowly circumscribed the role of state and local governments in this arena." *City of Auburn*, 260 F.3d at 1175; *see also Qwest Communications, Inc. v. City of Berkeley*, 433 F.3d 1253, 1256 (9th Cir.2006) ("We have interpreted this preemptive language to be clear and 'virtually absolute' in restricting municipalities to a 'very limited and proscribed role in the regulation of communications.' "). However, subsection (c) operates as a safe harbor, protecting local regulations that "manage the public rights-of-way" and "require fair and reasonable compensation" for the "use" thereof. *See City of Auburn*, 260 F.3d at 1177. Therefore, to determine whether Plaintiff has demonstrated a likelihood of success on the merits, the Court must first determine whether the challenged ordinance is preempted, and then whether it is saved by the TCA's safe harbor provision. *City of Berkeley*, 433 F.3d at 1256 ("Before considering whether Ordinance 6630 falls within the 'safe harbor,' we must determine whether the ordinance's regulations fall within the preemptive language of § 253(a).").

a. *Section 253(a)*

As noted above, the preemptive scope of subsection (a) is broad. It preempts local regulations "that not only prohibit outright the ability of any entity to provide telecommunications services, but also those that may have the effect of prohibiting the provision of such services." *City of Auburn*, 260 F.3d at 1175; *see also Qwest Corp. v. City of Portland*, 385 F.3d 1236,

1240–41 (9th Cir.2004) (same). The Ninth Circuit has interpreted section 253(a) to preempt even "ordinances [that] include features that, in combination, have the effect of prohibiting the provision of telecommunication services." *City of Auburn*, 260 F.3d at 1176. Further, for preemption purposes, a plaintiff need not demonstrate an actual inability to enter the market; it is sufficient that regulations "may have the effect of prohibiting the provision of telecommunication services." *City of Portland*, 385 F.3d at 1240; *see also NextG Networks of Cal. v. City of San Francisco*, Case No. 05–658, 2006 WL 1529990, *4 (N.D.Cal. June 2, 2006).

In *City of Auburn*, the plaintiff sought to invalidate city ordinances imposing a franchise system to manage telecommunications facilities in rights-of-way. *Id.* at 1166. The city's process included "a lengthy and detailed application form, including maps, corporate policies, documentation of licenses, certain specified items, and 'such other and further information as may be requested by the City.' " *Id.* at 1176. The process also included a public hearing requirement, discretionary factors, the power to regulate transferability of ownership and the reporting of stock sales. In addition, "the ultimate cudgel [was that] each city reserves discretion to grant, deny, or revoke the franchises and the Cities may revoke the franchise if the terms in the ordinance are not followed, even allowing the Cities to remove the company's facilities." *Id.* at 1176. The ordinance also authorized civil and criminal penalties for violations. *Id.* The court concluded that, "[t]aken together, these requirements 'have the effect of prohibiting' " the provision of telecommunications services "and create a substantial and unlawful barrier to entry into and participation in the Counterclaim Cities' telecommunications markets." *Id.*

Similarly, in *City of Berkeley*, the Ninth Circuit relied on *City of Auburn* to invalidate a local ordinance that required telecommunications companies to provide their qualifications and certifications of compliance with state and federal laws, and to publicly disclose all "agreements, tariffs, and other documents" related to providing services. 433 F.3d at 1257. The ordinance also required an annual written report on the terms and conditions of the services being furnished, copies of contracts and other documents related to tariffs or other reporting requirements under state and federal laws, the contact information for anyone denied service or access to service and reasons for denial, and any contracts related to changing ownership. *Id.* at 1257–58. The ordinance also gave the city the power to audit companies' financial information at any time on reasonable notice. *Id.* at 1258. Finally, the ordinance gave the city discretion to deny any permit and to impose civil and criminal penalties for violations. *Id.* The court found that this scheme "ha[s] the effect of prohibiting telecommunications companies from providing telecommunications services in the City of Berkeley." *Id.* at 1260.

Finally, in *County of San Diego*, the Ninth Circuit again reviewed and found preempted a telecommunications zoning ordinance imposing a burdensome permitting process. *Id.* at 714–16. There, the telecommunications ordinance imposed application submission requirements, imposed a public hearing requirement, and allowed the zoning authority to consider factors such as "whether a facility is appropriately 'camouflaged,' 'consistent with community character,' and designed to have minimum 'visual impact.'" *Id.* at 715–16. Moreover, the general zoning ordinance imposed open-ended discretion for approvals and the threat of criminal prosecution for violations. *Id.*

The common features of the preempted ordinances in these cases include: (1) a complicated application process (including reporting of financial information) and high fees; (2) a public hearing on the application; (3) imposition of criminal or civil sanctions for violations; and (4) unfettered discretion to approve or deny the application, or revoke a permit once issued. *See Cty. of San Diego*, 490 F.3d at 715–16 ("[T]he district court focused on the [ordinance's] application submission requirements, the discretion reserved to the zoning authority, the public hearing requirements, and the criminal penalties for violation of the use permit."); *see also GTE Mobilnet of California L.P. v. City & Cty. of San Francisco*, Case No. 05–4056, 2007 WL 420089, *4–5 (N.D.Cal. Feb.6, 2007); *NextG Networks*, 2006 WL 1529990, at *5; *Cox Communications PCS, L.P. v. City of San Marcos*, 204 F.Supp.2d 1260, 1265–66 (S.D.Cal.2002).

Plaintiff claims the application process in section 22.56 is unduly burdensome because it requires that Plaintiff: (1) "submit a burdensome volume of information detailing not only each of the node installations proposed, but also all the uses, buildings, and structures adjacent to every one of those Nodes"; (2) "provide the dimensions and state of improvement of all the adjoining streets and highways providing access to each of the sites where NextG proposes to install a node"; (3) "present site plans, drawn to exacting specifications requested by the hearing officer"; and (4) "produce various customized maps identifying each of NextG's proposed uses and all the uses on every parcel of land within a 500 foot radius of each proposed use." (Pl. Mot. at 19:18–20:3.)

Section 22.56.030 sets out the County's requirements for a complete CUP application (paraphrased):

· name and address of applicant;

- location of subject property (address or vicinity);
- legal description of the property involved;
- nature of the requested use;
- nature, condition and development of adjacent uses, buildings and structures;
- the dimensions and state of improvement of the adjoining streets and highways providing access to the proposed site of the requested use;
- other permits and approvals secured in compliance with the provisions of other applicable ordinances;
- a "site plan" drawn to a scale satisfactory to and in the number of copies prescribed by the Director indicating (a) the area and dimensions of proposed site for the requested use and (b) the location and dimensions of all structures, yards, walls, fences, parking and loading facilities, landscaping, and other development features;
- maps in the number prescribed and drawn to a scale specified by the Director, showing (a) the location of all property included in the request, (b) the location of all highways, streets, and alleys, and (c) the location and dimensions of all lots or parcels adjacent to the subject parcel of land;
- one map indicating the uses established on every lot and parcel of land shown within said 500–foot radius;
- a list, certified to be correct by affidavit or by a statement under penalty of perjury, of the names and addresses of all persons who are shown on the latest available assessment roll of the County of Los Angeles as owners of the subject parcel of land and as owning property within a distance of 500 feet from the exterior boundaries of the parcel of land to be occupied by the use;
- a map indicating where such ownerships are located; and finally

- *any other information as the Director may require.*

*See* section 2.56.030. In addition to this information, an applicant also has the burden to prove "to the satisfaction of the hearing officer" that the requested use will not:

(1) "Adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area";

(2) "Be materially detrimental to the use, enjoyment or valuation of property of other persons located in the vicinity of the site"; or

(3) "Jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare."

*See* section 22.56.040. The applicant must also establish the site is large enough to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features required by Title 22 or "as is otherwise required in order to integrate said use with the uses in the surrounding area" and that the site is adequately served by highways and streets and other public and private service facilities as required. *Id.* The fee to apply for a CUP is $5,369, *see* sections 56.22.050, 56.60.100, and the County may deny any application outright "if such application does not contain the information" specified by sections 56.22.030 and 56.22.040, *see* section 22.56.060.

The Court has little trouble concluding that this process is so burdensome and Byzantine as to erect a barrier to providing telecommunications services. Not only does the ordinance impose a lengthy, detailed, and expensive application process riddled with administrative hoops, missing a single one of which causes the outright rejection of the costly application, but it also allows the Director to request further *unspecified* information. *See* section 22.56.030. And even if Plaintiff succeeds

in submitting an acceptable application and pays the $5,000 fee, it still has the heavy burden to prove the proposed use complies with such subjective and imprecise concepts as the "health, peace, and comfort" of the area's residents, does not impact the "use, enjoyment or valuation of property" of neighbors, and does not endanger "public health, safety or general welfare." *See* section 22.56.040.

Nearly identical application processes have been preempted in other cases. As the court in *NextG Networks* held, an application process is burdensome when it "requires an explanation of the purpose of the facilities, maps showing the location of the facilities, pictures of the proposed locations, drawings and specifications of the equipment to be installed, and contact information for the party requesting the permit" and imposes an "$800 processing fee as well as $4,000 to cover 'the Department's administrative costs and attorney's fees." 2006 WL 1529990, at *5; *see also Cox Communications*, 204 F.Supp.2d at 1265 ("The ordinance required the applicants to complete a detailed application process [and] pay a $3,400 registration fee[.]"); *GTE Mobilnet*, 2007 WL 420089, at *4 (the challenged ordinance "authorized the DPW to impose extensive application requirements through rules and regulations"); *City of Auburn*, 260 F.3d at 1176 ("[T]elecommunications companies must submit a lengthy and detailed application form, including maps, corporate policies, documentation of licenses, certain specified items, and such other and further information as may be requested by the City." (internal quotations omitted)).

In addition to the lengthy application, the County also requires a public hearing, *see* section 22.56.080, and yet another uncodified hearing before the "Altadena Town Council," a fact left undisputed by the County. (Pl. Mot. at 11:25–12:13; Pl. Reply at 9:12–18.) These public hearing requirements further complicate the already burdensome application process, as courts have nearly universally held. *See, e.g., NextG Networks*, 2006 WL 1529990, at *5 (finding preemption where "the Department must conduct a public hearing on the permit."); *Cox Communications*, 204 F.Supp.2d at 1265 (same); *GTE Mobilnet*, 2007 WL 420089, at *4 (same); *Cty. of San Diego*, 490 F.3d at 715–16 (same); *City of Auburn*, 260 F.3d at 1176 (same).

Further, the ordinance imposes criminal and civil sanctions for violating its provisions. *See* section 22.60.340. Although less universally cited by Courts in determining an ordinance's burden on an applicant, this nonetheless further complicates the process. *See, e.g., Cox Communications*, 204 F.Supp.2d at 1265; *Cty. of San Diego*, 490 F.3d at 715–16; *City of Berkeley*, 433 F.3d at 1258; *City of Auburn*, 260 F.3d at 1176.

Finally, section 22.56 provides unfettered discretion to County officials at multiple points in the approval process, including discretion to ultimately deny the application, the "ultimate cudgel" in the preemption analysis. *City of Auburn*, 260 F.3d at 1176; *Cox Communications*, 204 F.Supp.2d at 1265 (quoting same). For example and as noted above, section 22.56.030 allows the County to request additional unspecified information in the application, and section 22.56.050 permits summary rejection of the application for failing to provide it. Then section 22.56.040 imposes vague burdens for an applicant to prove broadly stated, generalized discretionary concerns such as "health, peace, comfort or welfare," "use, enjoyment, and valuation of property," and "public health, safety or general welfare." Even if an applicant carries this burden, the County can still deny an application under section 22.56.090 by concluding that the proposed use is inconsistent

with the "general plan" of the area, whatever that might mean.

Further, the County may impose conditions on the CUP including but not limited to requiring yards, open spaces and buffer area's, fences, walls, parking facilities, landscaping, signs, a site plan, the mitigation of nuisance factors or other conditions "as will make possible the development of the proposed conditional use in an orderly and efficient manner and in general accord with all elements of the general plan and the intent and purpose of this Title 22." Section 22.56.100. The County may revoke a permit that does not comply with these largely discretionary provisions. Section 22.56.1780. An applicant may appeal the denial of a permit, but the Director again has discretion to request further information from the applicant "as may be necessary," section 22.56.1670, and may deny an application that does not "insure the protection of public health, safety and general welfare, prevent adverse effects on neighboring property and is in conformity with good zoning practice" or is not "suitable from the standpoint of functional developmental design," section 22.56.1690. These provisions give the County de facto discretion to deny an application for nearly any possible reason under the guise of any of these terms.

As a result of these broad discretionary provisions, section 22.56 must be preempted. *See City of Berkeley*, 433 F.3d at 1258 (preempting an ordinance that "allows the City to deny an excavation permit and thus the use of public rights-of-way if the applicant fails to comply with any other requirement of the ordinance"); *City of Auburn*, 260 F.3d at 1176 ("[T]he Cities may revoke the franchise if the terms in the ordinance are not followed ..."); *cf. GTE Mobilnet*, 2007 WL 420089, at *5 ("[T]he

wholly discretionary decision-making power granted to the Board of Supervisors, without any governing or limiting standards, certainly may have a prohibitive effect on the provisions of telecommunications services."); *NextG Networks*, 2006 WL 1529990, at *5 ("The Board has plenary power to accept or reject the Department's recommendation.").

The County argues against preemption on two principal bases: (1) section 22.56 is distinguishable from the one preempted in *City of Auburn* because it does not require a "franchise"; and (2) section 22.56 is of general applicability and "nothing in the TCA specifically prohibits regulations based on substantive local land use factors." (Def. Opp. at 6–9.)[3] Both of these arguments have been squarely rejected by the Ninth Circuit and the Court rejects them now.

The *County of San Diego* court specifically looked at *City of Auburn's* franchise ordinance and concluded in the context of a zoning ordinance:

> We find the County's retort—that the elements of the WTO challenged by Sprint are traditional facets of zoning that are unobjectionable for the simple reason that the [ordinance] is a zoning ordinance rather than a franchise or public right-of-way ordinance—unconvincing. Though *Auburn* discussed a franchise ordinance, our concerns in this case are largely the same. We conclude that the [ordinance] imposes a permitting structure and design requirements that present barriers to wireless telecommunications within the County, and is therefore preempted by § 253(a).

*Cty. of San Diego*, 490 F.3d at 715–16; *see also GTE Mobilnet*, 2007 WL 420089, at *7 ("[T]he distinction between a franchise

---

**3.** The County also argues that section 22.56 is saved by section 253(c). The Court addresses that issue *infra*.

permit and an encroachment permit is irrelevant because denial of either permit may prohibit the provision of service under § 253(a).").

Moreover, simply because section 22.56 is of general applicability does not save it from preemption as applied to Plaintiff for a very practical reason:

> If a city could circumvent the requirements of section 253(a) simply by enacting regulations that apply to all utilities, then federal law would fail to provide any meaningful protection to telecommunications providers. Under the City's proposed construction, it could enact a regulation allowing the City to arbitrarily deny any utility access to public rights-of-way without violating section 253(a). The City's position cannot be reconciled with the plain language of the statute or the deregulatory purpose which it serves.

*NextG Networks*, 2006 WL at 1529990, *6 (distinguishing dicta in *City of Portland*, 385 F.3d at 1242, which suggested that a facially neutral statute might be valid under section 253(a)); *see also GTE Mobilnet*, 2007 WL 420089, at *3–4 (agreeing with the court in *NextG Networks* ). The plain terms of section 253(a) authorize preemption for statutes of general applicability as they apply to telecommunications companies: "No state or local statute or regulation, or other state or local legal requirement, may prohibit *or have the effect of prohibiting* the ability of any entity to provide any interstate or intrastate communications service." This language plainly preempts not only statutes that may "prohibit" the provision of services on their face, but also that "have the effect of prohibiting" the provision of services in their application. Thus, the general applicability of section 22.56 does not save it from preemption in this case.

Section 253(a) was passed "to promote competition among and reduce regulation of telecommunications providers." *City of Auburn*, 260 F.3d at 1170. As a result, the TCA confers a special status on Plaintiff, which includes avoiding "barriers to entry" created by state and local governments, such as application schemes that have the effect of prohibiting the provision of service. *See id.* Precedent dictates that the scheme embodied in section 22.56 is simply too burdensome to be imposed on Plaintiff. The County's CUP process is therefore preempted by section 253(a) as a "barrier to entry."

### b. *Section 253(c)*

■ Section 253(c) has been described as a "safe harbor," since "[o]nly regulations that do not fall within a safe harbor provision ... are preempted." *City of Auburn*, 260 F.3d at 1177. Section 253(c) states, "[n]othing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government." Plaintiff claims that section 22.56 does not relate to "manag[ing] the public rights-of-way" and the County applies the ordinance in a discriminatory manner. The Court will address these contentions in turn.

The management of rights-of-way has been interpreted to mean "control over the right-of-way itself, not control over companies with facilities in the right-of-way." *Id.* The court in *City of Auburn* relied on the FCC's interpretation of section 253(c):

> [S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to pre-

serve the physical integrity of streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way ... [T]he types of activities that fall within the sphere of appropriate rights-of-way management ... include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.

*Id.* (citing *In re TCI Cablevision of Oakland Cty., Inc.,* 12 F.C.C.R. 21396, ¶ 103 (F.C.C.1997)).

The *City of Auburn* court also looked at the comments by Senator Dianne Feinstein, who offered examples of permissible regulations during the floor debate of section 253(c), including those that:

> (1) regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts; (2) require a company to place its facilities underground, rather than overhead, consistent with the requirements imposed on other utility companies; (3) require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation; (4) enforce local zoning regulations; and (5) require a company to indemnify the City against any claims of injury arising from the company's excavation.

*Id.* (citing *In re Classic Telephone, Inc.,* 11 F.C.C.R. 13082, ¶ 39 (F.C.C.1996)).[4] The court concluded that, among other features

not applicable here, "[r]egulations requiring the applicant [to] submit proof of its financial, technical and legal qualifications do not regulate the public rights-of-way," nor does requiring a "description of telecommunications services to be provided." *Id.* at 1178 ("The upshot of the application process is to regulate the provision of telecommunications services rather than to regulate the right-of-way."). In a footnote, the court also found objectionable requirements such as a public hearing and non-cost-based fees. *Id.* at 1179 n. 19.

The court in *City of Auburn* also held that provisions granting "unfettered discretion" "are too vague and too broad to comply with § 253(c)." *Id.* at 1179. Later courts interpreted this to be a definitive factor under section 253(c). *See NextG Networks,* 2006 WL at 1529990, *7 (refusing to apply the safe harbor provision because "the authority to prohibit NextG from installing its facilities at all is control over a company with facilities in the right of way, rather than control over the right-of-way itself." (citation omitted)); *GTE Mobilnet,* 2007 WL 420089, at *6 (same).

Even a cursory review of section 22.56 reveals that it is not related only to the management of the rights-of-way as identified by *City of Auburn.* Section 22.56.030 requests information on the nature of the requested use, the uses of adjacent buildings and structures, the location and dimensions of all structures, yards, walls, fences, parking and loading facilities, maps indicating the ownership of all surrounding parcels of land, and any other information as required by the Director. This information has little to do with managing the physical integrity of the rights-of-way, the flow of traffic, the provision of other utili-

---

4. Although Senator Feinstein included "enforce local zoning ordinances" as one permissible activity under section 253(c), her comment must be read in harmony with the plain text of the provision, so any enforcement of local zoning ordinances must relate to managing the rights-of-way.

ties, or any construction schedules, and cannot be viewed as management of the rights-of-way preserved by section 253(c). Moreover, whatever argument may be made about the relationship of the requested information to the management of the rights-of-way, the unfettered discretion of the Director to ask for unspecified additional information expands this provision far beyond the scope of section 253(c). Sections 22.56.040 and 22.56.090 take into consideration the use, enjoyment, and valuation of adjoining property, and the peace, comfort and welfare of neighbors. Section 22.56.060 allows a summary denial of an application not conforming to these requirements. The County has broad discretion to grant or deny the application, based on enumerated grounds or on such amorphous criteria as "good zoning practice" and "functional development design." Section 22.56.1690. None of these requirements directly relates to the management of the rights-of-way as outlined by *City of Auburn,* and therefore cannot be saved by section 253(c).

Plaintiff also claims that the County discriminatorily applies section 22.56 to wireless providers like itself, while exempting traditional carriers who employ wireline technology, such as AT & T and Verizon. (Pl. Reply at 11:20–23.) The County admits this point: "All telecommunications companies, including wireless service providers and 'telecommunications carriers' must obtain a conditional use permit ('CUP') before installing *wireless* facilities in public rights-of-way." (Def. Errata at

1:17–20 (emphasis added).) Section 253(c) requires that rights-of-way must be managed in a nondiscriminatory way. *See NextG Networks,* 2007 WL 1529990, at *8. Section 253 contains no distinction between wireless and wireline facilities and the Ninth Circuit has found none. *See Cty. of San Diego,* 490 F.3d at 718 ("[W]e determine that local zoning ordinances regulating the construction and placement of wireless communications facilities are within the preemptive scope of § 253(a) (removing barriers)."). Further, even if it did, Plaintiff has a Certificate of Public Convenience or Necessity, classifying it as a "telephone corporation" under California law. As a result, the County cannot treat Plaintiff differently simply because it provides or seeks to provide wireless services. For this independent reason, the County's application of section 22.56 to Plaintiff is not saved by section 253(c).[5]

■ Plaintiff has demonstrated a likelihood of success on the merits of its preemption claim. Section 22.56 is so burdensome and complex that it erects a barrier to entry prohibited by section 253(a). Moreover, its provisions are not saved by section 253(c) because they do not directly relate to the management of the rights-of-way and because the County has discriminatorily applied them to wireless providers like Plaintiff.

### 2. *State Preemption*

Plaintiff argues that it is likely to succeed on the merits of its claim that section

---

**5.** The parties have not requested the Court to sever any portion of section 22.56 it finds preempted. In any event, the Court would be unwilling to do so since the ordinance "contain[s] a complex mix of application procedures, approval requirements ... and discretionary 'catchall' clauses whose preempted provisions are so pervasive that it is not practicable to conduct a line-by-line severability analysis[.]" *City of Auburn,* 260 F.3d at 1180.

Moreover, severing logically applies only to those provisions saved by section 253(c), since, under 253(a), the process in section 22.56, as a whole, erects an impermissible barrier. Because the Court finds that the County discriminatorily applied section 22.56 to Plaintiff, the ordinance cannot be saved by section 253(c) and must be preempted under section 253(a) in its entirety.

22.56 is also preempted by section 7901 of the California Public Utilities Code. Because the Court finds that Plaintiff is likely to succeed on the merits of its argument that section 22.56 is preempted under federal law, the Court need not address this complicated question of state law. *See NextG Networks,* 2006 WL at 1529990, *9 ("As the court has concluded that the City's regulation is preempted by section 253, it need not consider whether it is also preempted by California law.").

### B. Irreparable Injury.

■ Plaintiff claims that it will suffer imminent irreparable harm to its business goodwill and reputation if the Court fails to enjoin the application of section 22.56 by the County, thereby forcing it to breach its contracts with customers. The County does not dispute that injury to business goodwill and reputation can constitute irreparable harm sufficient to support an injunction. *See Cox Communications,* 204 F.Supp.2d at 1263; *Rent–A–Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("Intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *Optinrealbig.com, LLC v. Ironport Sys., Inc.,* 323 F.Supp.2d 1037, 1050 (N.D.Cal.2004) ("Damage to a business's goodwill is typically irreparable injury because it is difficult to calculate.").

Plaintiff has persuasively demonstrated that it will suffer irreparable harm if it cannot surmount the barrier imposed by section 22.56 and effectively enter the telecommunications market. The wireless telecommunications industry is capital-intensive and consists of only a small number of major players, so the inability to dispatch services and the resulting loss of current revenue could result in insufficient funding for future projects and inhibit Plaintiff's ability to grow its business. Other courts addressing similar issues have agreed. *See Cox Communications,*

204 F.Supp.2d at 1263–64 (finding irreparable harm from a process that delayed the plaintiff's ability to provide wireless coverage for its customers); *Qwest Communications Corp. v. City of Berkeley,* 146 F.Supp.2d 1081, 1103 (N.D.Cal.2001) (finding irreparable harm from a process causing breach of a customer contract), *aff'd,* 433 F.3d 1253 (9th Cir.2006).

The County argues that the harm in this circumstance is not "irreparable" because Plaintiff entered contracts with unrealistic timelines. (Def. Opp. at 5:21–22.) While it may be true that a plaintiff cannot cause harm to itself and then claim it is irreparable, this is not such a case. Here, Plaintiff's harm stems from the barrier erected by section 22.56, not from Plaintiff's contractual obligations. Moreover, Plaintiff should not be required to build time into its contracts to comply with a likely invalid permit process imposed by the County. The open-ended discretionary process in section 22.56 provides few if any timelines, so Plaintiff can never accurately estimate how long that permitting process will take. Plaintiff has sufficiently demonstrated that irreparable harm will likely result from complying with the permitting process in section 22.56.

### VI. SCOPE OF INJUNCTION

■ Because the Court finds that an injunction is appropriate in this case, it must now define its scope. Plaintiff asks the Court for an order "(1) enjoining the County from enforcing Chapter 22.56 of the County Code against NextG, (2) requiring the County to issue to NextG within 10 days of submission of applications by NextG, standard encroachment permits on the same terms and conditions, if any, as required of AT & T and other telecommunications providers, and (3) requiring the County to grant within 10 days of the Court's Order all of NextG's outstanding

applications." (Pl. Mot. at 25:15–20.) The broad scope of these requests, however, does not logically follow from the scope of Plaintiff's challenge to section 22.56.

The Court can and will enjoin the County from enforcing section 22.56 against Plaintiff since it is likely preempted by section 253. The Court cannot, however, order the County to issue any encroachment permits. Plaintiff has not described, let alone challenged, that process. The Court will not usurp the County's role as a valid permitting authority by ordering it to issue a permit pursuant to a process that has not been challenged.[6]

## VII. CONCLUSION

Plaintiff has persuasively demonstrated that, in this conflict between federal and state law, federal law prevails. Plaintiff will likely prevail with its contention that the burdensome CUP process in section 22.56 of the County's code is preempted by section 253(a) and it is not saved by section 253(c).

Therefore, the Court hereby ORDERS:

(1) The County is enjoined from enforcing the Conditional Use Permit Ordinance, section 22.56 of Title 22 of the County Code, against Plaintiff for the provision of telecommunications services; and

(2) The Court orders the County to grant Plaintiff's March 1, March 15, and April 3, 2007 applications currently pending under section 22.56 within 10 days of the date of this order.

**IT IS SO ORDERED.**

---

**6.** It is possible that the County will have to issue an encroachment permit to Plaintiff on a non-discriminatory basis. Like the CUP process in section 22.56, however, Plaintiff would have to establish that it is both preempted under section 253(a) and it is not saved by section 253(c). That question is not properly before the Court.